# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-3966

_____

Melissa Abdouch,                                    *
                                                    *
      Plaintiff - Appellant,                      *
                                                    *  Appeal from the United States
    v.                                            *  District Court for the District of
                                                    *  South Dakota.
Vicki Burger; Raina Boyum; Kathrin                  *
Betzing; Alison Downs, in their                     *
individual capacities and in their                  *
capacities as employees of the South                *
Dakota Department of Social Services,               *
                                                    *
      Defendants - Appellees.                     *

_____

Submitted: September 15, 2005
Filed: October 20, 2005

_____

Before MELLOY, BEAM, and BENTON, Circuit Judges.

_____

MELLOY, Circuit Judge.

Melissa Abdouch brought this action under 42 U.S.C. § 1983 against the defendants, a group of South Dakota social workers. She alleged that after the defendants discovered her infant son had seventeen broken bones, they violated her constitutional rights by removing him from her care for a period of approximately

seven months. The district court[1] found the defendants entitled to qualified immunity and granted summary judgment in their favor. We affirm.

## I.

Melissa Abdouch and her husband, Michael Abdouch, lived with their three children: A.A., B.A., and C.A. On August 8, 2002, Melissa took the youngest child, eleven week-old C.A., to a cardiologist because of a heart murmur. The cardiologist took a chest x-ray that revealed multiple fractured ribs. The next day, August 9, the Abdouch's family physician informed Melissa that the x-ray had revealed "bone abnormalities." He asked her to bring C.A. to a hospital emergency room. A physical exam and x-rays taken at the emergency room revealed that C.A. had seventeen fractures including fractures of the ribs and clavicle and of the arms and legs, both above and below the joints. Despite the severity and extent of C.A.'s injuries, all doctors involved with the case later concurred that the injuries would not have been apparent to a lay person.

Two police detectives interviewed Melissa and Michael, starting at the hospital and continuing at a police station. The police quickly focused on Michael as the suspected abuser, although there was little evidence to suggest what role each parent might have played. Melissa and Michael denied harming C.A. and denied having knowledge of any abuse. When Michael was later deposed, however, he admitted that he had anger management issues and that Melissa had encouraged him to seek anger management help or counseling at about the time that the doctors discovered C.A.'s injuries.

---

[1]The Honorable Karen E. Schreier, United States District Judge for the District of South Dakota.

Defendant Alison Downs was the Department's intake social worker assigned to the case. She was present at the police station. Downs permitted Melissa to take C.A. home on August 9 on the condition that Michael not stay at the family's home.

The following day, August 10, Melissa brought the older children to the hospital for evaluation. Although neither exhibited signs of abuse, Downs and her supervisor, defendant Raina Boyum, decided to remove all three children from the home and place them in a care center. Downs completed a "Child Placement Agreement and Case Plan" form for each child to authorize the care center to provide services. In addition to noting C.A.'s severe injuries, Downs noted on the forms that there was possible sexual abuse. Boyum initialed the forms. There was no evidence of sexual abuse.

Also on August 10, Downs told Melissa that there would be a temporary custody hearing the following day and that she would recommend the court send the three children home with Melissa. On August 11, at the hearing, Downs did not make the recommendation. After the hearing, Downs and Boyum released A.A. and B.A. to Michael's parents and placed C.A. in foster care. Michael returned home to live with Melissa. Melissa had urged that C.A. be placed with the children's grandparents, who were willing to take C.A. into their home and/or move to care for C.A. in a different location. Following C.A.'s placement in foster care, Melissa and Michael were each allowed one one-hour supervised visit per week.

On August 18, Downs completed an information collection form. She marked boxes to indicate that C.A. had suffered physical abuse in the "head, face, genitals, stomach or back area." She marked boxes to indicate that C.A. required "immediate medical attention," that there was "no evidence" of sexual abuse, and that there had been "frequent or increasingly harsh physical contact." She also marked boxes to indicate that Melissa was "emotionally handicapped" and had an "uncontrolled mental illness." Finally, without noting which caretaker she was referring to, Downs marked

boxes to indicate that the caretaker had an "unrealistic expectation of [the] child's behavior" and did not "believe that there is a problem."

After Downs and Boyum completed their initial investigation and intake, case manager Kathrin Betzing and her supervisor, Vicki Burger, took over the case. According to Betzing and Burger, C.A. did not tolerate the supervised visits from Michael and Melissa well and screamed and refused to eat after the visits. During one of Michael's visits, Michael became frustrated and called C.A. a "little shit." Melissa contests the Department's claim that C.A. did not tolerate her visits well.

An Assistant Attorney General involved in the case, Anthony Sanchez, recommended that the Department terminate the supervised visits. Sanchez stated that Melissa was not cooperative in the abuse investigation and that he did not want her to have more visits until he knew "what part [Melissa] had in the child's injuries, whether she actually caused them or . . . knew [Michael] caused them." Betzing and Burger decided in September to terminate the visits. At about the same time, they decided to seek the termination of Michael's and Melissa's parental rights regarding C.A.

Melissa testified that she wanted to remain married to Michael and have her children at home. She initially appeared not to believe that Michael had abused C.A. She testified that she was told by the Department that she would not regain custody of her children if she remained married to Michael. She requested that C.A. be tested for a rare congenital disease that causes brittle bones, osteogenesis imperfecta. C.A. was tested in late September and found not to have the disorder. Melissa filed for divorce on October 5, 2000, one week after she received the test results. The divorce became final on January 20, 2001. The January divorce decree did not resolve any issues of child custody and visitation between Michael and Melissa. When asked, Melissa could not say whether she would have filed for divorce if the Department had not recommended that she do so.

-4-

Notwithstanding the fact that Melissa filed for divorce, Michael continued to live with Melissa until just before a state court adjudicatory hearing on October 18. At the hearing, a state court judge relied on the medical evidence of C.A.'s injuries to determine that C.A. was an abused or neglected child. After the hearing, C.A.'s placement in foster care continued, and the two older children returned to the family's home to live with Melissa.

Investigators who visited Melissa's home after Michael moved out reported that it appeared that a married couple still lived at the home. Further, in discussions with one of the social workers before Michael moved out, Melissa initially lied about Michael's living arrangements. Melissa first stated that Michael had already moved and that he was living with a friend. When pressed to give the friend's name, however, Melissa became flustered and admitted that Michael still lived at home. Based on this deception, Melissa's reluctance to believe that Michael had abused C.A., and her claimed ignorance that abuse had occurred, the defendants believed that Melissa had filed for divorce only as a pretext to regain custody of C.A..

A criminal investigation continued throughout this time. A prosecutor, Pam Tiede, filed an abuse and neglect petition. Michael eventually admitted that he had treated C.A. roughly, that he "lost his cool," and that he must have injured C.A., although he said he did not purposely injure C.A. In November, he agreed to plead guilty to simple assault. He entered a guilty plea on February 22, 2001.

Melissa's visits with C.A. resumed in December 2000. Melissa's visits were initially once per week and later twice per week. In January 2001, she was allowed to take C.A. on home visits. In February 2001, Melissa was permitted to begin taking C.A. on overnight visits. On March 15, 2001, C.A. was conditionally returned to Melissa on a full-time basis. Following a custody hearing on June 13, 2001, all conditions on Melissa's custody of C.A. were removed.

Notwithstanding the transitioning of C.A. back into Melissa's custody, Betzing and Burger continued to seek termination of Melissa's parental rights. Before the June 13 hearing, Prosecutor Tiede told Burger and Betzing that she didn't believe there was sufficient evidence to terminate Melissa's parental rights. At Burger's and Betzing's request, Assistant Attorney General Sanchez took the case from Tiede. Sanchez reviewed the case, and with Burger and Betzing, decided not to pursue the termination of rights. They did not notify Melissa of this decision until June 13, the day of the hearing. At the hearing, the Department sought termination of Michael's parental rights and sought continuation of the case against Melissa to permit continued monitoring of C.A. The court dismissed all proceedings as against Melissa and deferred the case as to Michael.

Melissa brought her claims in the present action under § 1983. She concedes that it initially was appropriate for the defendants to remove the children from her home. She alleges, however, that the defendants continued to seek the termination of her parental rights after it became clear that the defendants could not make the showing necessary to terminate her rights. She characterizes this action as a violation of her right to be free from prosecution without probable cause. She also alleges that the defendants' protracted placement of C.A. in foster care deprived her of her liberty interest in the care and custody of her children.

As to the prosecution-related claim, the district court found that the social workers were analogous to prosecutors and therefore entitled to absolute immunity for their initiation of judicial proceedings against Melissa. As to the alleged violation of her liberty interest as a parent, the district court found that qualified immunity applied. We affirm.

-6-

II.

Qualified immunity protects public officials unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. Littrell v. Franklin, 388 F.3d 578, 582 (8th Cir. 2004) ("'officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.'") (quoting Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992)). Qualified immunity is a question of law that we review de novo. Littrell, 388 F.3d at 584-85. In reviewing a grant of qualified immunity, "[t]he sequence of our analysis is to ask first whether, taken in the light most favorable to the plaintiff, the facts alleged show the officer's conduct violated a constitutional right; and second, whether, in the specific context of the case, the right was clearly established." Swipies v. Kofka, 348 F.3d 701, 703 (8th Cir. 2003).

We have previously recognized that parents have an important but limited substantive due process right in the care and custody of their children. Manzano v. South Dakota Dept. of Soc. Servs., 60 F.3d 505, 509-10 (8th Cir. 1995). The right is limited because the state has a potentially conflicting, compelling interest in the safety and welfare of the children. Id. at 510 ("'[T]he liberty interest in familial relations is limited by the compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves.'") (quoting Myers v. Morris, 810 F.3d 1437, 1462 (8th Cir. 1987)). The right is important because of the need to "curb[] overzealous suspicion and intervention on the part of health care professionals and government officials, particularly where the effect of such overzealousness may have the effect of discouraging parents or caretakers from communicating with doctors or seeking appropriate medical attention for children with real or potentially life-threatening conditions." Thomason v. SCAN Volunteer Servs., Inc., 85 F.3d 1365, 1373 (8th Cir. 1996).

The net result of these competing interests is that we must weigh the interests of the state and child against those of the parents to determine whether a constitutional violation has occurred. Under this balancing test, the officials' actions must have been based on a reasonable suspicion of abuse and must not have been disproportionate under the circumstances. Id. at 1371-72 ("The difficulty in the present case is not whether such a reasonable suspicion can be found, but rather, whether the actions taken by the defendants and the resulting disruption to plaintiffs' familial relations with [the child] were so disproportionate under the circumstances as to rise to the level of a constitutional deprivation.").

"The need to continually subject the assertion of this abstract substantive due process right to a balancing test which weighs the interest of the parent against the interests of the child and the state makes the qualified immunity defense difficult to overcome." Manzano, 60 F.3d at 510. Even where this balancing reveals a constitutional violation, qualified immunity still applies unless the constitutional violation was so clear that an objectively reasonable official under the circumstances would have recognized the disproportionality or lack of reasonable suspicion. In the present case, we need not reach this second step of the qualified immunity analysis because we conclude that the defendants' conduct, viewed in a light most favorable to the plaintiff, did not violate a constitutional right.

Because Melissa concedes that it initially was proper for the defendants to remove C.A., her allegations of a constitutional violation focus on her extended deprivation of custody claim. For a substantial period of time after the discovery of C.A.'s severe injuries, the defendants did not know which parent harmed C.A., whether both parents had a role in harming C.A., or whether the injuries were due at least in part to one or both parents' negligence. Even as investigators' attention focused on Michael, a clear picture of the abuse and of Melissa's role in, or knowledge of, the abuse eluded investigators. This uncertainty caused the defendants to question Melissa's ability to care for and protect C.A.

The defendants' actions, however, were not based solely on speculation or uncertainty. Rather, the defendants reasonably believed that Melissa was not being honest with them. She attempted to deceive the defendants regarding Michael's living arrangements. In addition, from the defendants' perspective, she appeared reluctant to believe or admit that Michael had abused C.A. and reluctant to file for divorce. Also, she continued to live with Michael until shortly before the October 18 hearing. All of this information, when viewed against the backdrop of C.A.'s serious and unexplained injuries, clearly shows a basis for the defendants' reasonable suspicion that Melissa was complicit in the abuse or guilty of neglect. It was not unreasonable to hold C.A. in foster care during this time.

Further, the state court's October 18 decision, following notice and a hearing, demonstrated the reasonableness of the defendants' suspicions and did nothing to vindicate either Melissa or Michael. The court held that C.A. was an abused or neglected child, not that Michael was guilty nor Melissa innocent. Later, when Michael agreed to plead guilty, his statements shed little to no light on the events that caused C.A.'s injuries. The defendants, nevertheless, began to transition C.A. back into Melissa's care.

Melissa's main complaint appears to be that this transition was slower than necessary. In balancing the rights of the parents against the interests of the child, we disagree. The Department was under a duty to protect C.A. and formulate a transition plan that protected C.A. from any further abuse or neglect. This duty required the Department to ensure that Michael did not have access to C.A. In that regard, the divorce was not final until January, and even then, custody issues were not resolved by the divorce decree. Before that time, visitation had resumed. Home visits and overnight visits followed, and by March, C.A. was in the plaintiff's care on a full time basis. Given these facts, as well as the severity of the injuries and the uncertainties about Michael's situation, the deprivation of custody from October 18 until full-time placement in March was not unreasonable, and certainly did not rise to the level of a

constitutional violation. Accordingly, the defendants are entitled to the protection of qualified immunity.[2]

As a final matter, we note that the district court correctly applied absolute immunity to shield the defendants from liability for initiating or maintaining judicial proceedings. See Thomason, 85 F.3d at 1373 ("To the extent [a state authorized child welfare agency and its worker] are sued for initiating judicial proceedings, [the welfare worker's] role was functionally comparable to that of a prosecutor."); Myers, 810 F.2d at 1452 ("Accordingly the decision to file charges is protected, even in the face of accusations of: vindictive prosecution, or reckless prosecution without jurisdiction, or conspiracy to prosecute for a crime that never occurred.") (internal citations omitted); Martin v. Aubuchon, 623 F.2d 1282, 1285 (8th Cir. 1980) (finding that absolute immunity applied to protect a prosecutor who had initiated the termination of parental rights without notice to the parents).

The judgment of the district court is affirmed. Appellees' pending motion to strike portions of the Appellant's brief is denied as moot.

——————————————————

[2]Melissa argues that various specific actions by the defendants showed personal animosity. For example, Melissa complains that Downs lied about her intention to recommend that the children stay with Melissa at the August 11 hearing and that Downs and Boyum suggested on forms that there was evidence of sexual abuse when no such evidence existed. Finally, Melissa argues that because the physicians believed a lay person would not have recognized C.A.'s injuries, she had no notice of the injuries and should not have been the target of an abuse and neglect investigation. These arguments are misplaced. As discussed above, no constitutional violation occurred. Without a violation of constitutional rights, qualified immunity applies regardless of whether an official harbors personal animosity. Also the fact that C.A.'s injuries were difficult to detect does not disprove the reasonable suspicion as set forth above.