# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

————————————

No. 04-4032

————————————

| | | |
|---|---|---|
| Marybeth Dornheim, individually and on behalf of her infant son Tanner Tibbetts; Michael Tibbetts, | * * * * | |
| | * | |
| Appellants, | * * | |
| | * | |
| v. | * * | Appeal from the United States District Court for the |
| | * | District of North Dakota. |
| Michael Sholes, individually and as a police officer; John Packett, as Chief of the City of Grand Forks Police Department; Kate Kenna, individually and as Administrator; Patricia Sele, individually and as social worker; Randy Slavens, individually and as social worker; Keith Berger, as Director of Grand Forks Social Services; Melissa Schmalenberger, individually and as Guardian Ad Litem; Dr. Steven Timm; Dr. Ronald Miller, | * * * * * * * * * * * * * | [PUBLISHED] |
| | * | |
| Appellees. | * | |

————————————

Submitted: September 14, 2005
Filed: December 7, 2005(Corrected: 12/23/05)

————————————

Before MURPHY, HANSEN, and GRUENDER, Circuit Judges.

————————————

HANSEN, Circuit Judge.

Marybeth Dornheim, on behalf of herself and her minor son, Tanner, and her adult son, Michael, (collectively "the Dornheims") filed a civil rights lawsuit against the police officers, social workers, court-appointed doctors, and Tanner's court-appointed guardian ad litem who were involved in Dornheim's state-court custody dispute with her ex-husband. The Dornheims appeal from the district court's dismissal of the lawsuit, and we affirm.

I.

Because the district court dismissed the lawsuit under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, we take the facts from the face of the complaint as true. See Federer v. Gephardt, 363 F.3d 754, 757 (8th Cir. 2004). Dornheim, a social worker herself, was involved in a bitter divorce and custody dispute with her ex-husband, James Tibbetts. The Grand Forks County Social Services Agency (Agency) investigated allegations of domestic violence in October 1998, prior to the divorce. Following the Agency's investigation, which Dornheim characterized as "woefully" inadequate, the Agency found Dornheim partially responsible for the domestic violence. Dornheim made an administrative appeal, which was forwarded to Kate Kenna, a social worker who had supervisory authority over Dornheim when Dornheim worked as a social worker. Dornheim claims that Kenna prevented the appeal from being heard, and that Kenna made defamatory remarks about Dornheim to others in the Agency.

During and following the divorce, both spouses accused the other of abusing Tanner, approximately nine years old at the time, by leaving bruises on him. In July 2000, Tibbetts asked his neighbor, defendant Randy Slavens, another social worker, to look at bruises on Tanner's arm allegedly caused by Dornheim. Slavens filed a report of abuse and neglect and testified at the state-court custody hearing. Detective

Michael Sholes investigated the allegations of child abuse and also testified in the state custody proceedings in support of Tibbetts.

Patricia Sele, a social worker, was involved in the investigation of the second allegation of abuse which was based on a report made by a doctor at the urgent care clinic Dornheim took Tanner to when Tanner returned from his father's house with facial bruising. According to Dornheim, Sele's investigation, which concluded that both parents "needed services," was inadequate and inappropriate. The finding that Dornheim needed services would have been detrimental to Dornheim's career as a social worker and was ultimately withdrawn before it could be appealed. Nevertheless, during the pendency of the state proceedings, Dornheim lost her job as a social worker.

Ms. Schmalenberger was Tanner's court-appointed guardian ad litem during the divorce and custody proceedings. According to Dornheim, Attorney Schmalenberger interfered with Dornheim's right and ability to make decisions for Tanner, made numerous ex parte communications with the state court judge and Tibbetts' attorney, made counseling recommendations that violated various codes of ethics and were harmful to Tanner, and generally failed to meet her guardian ad litem responsibilities.

Dr. Steven Timm and Dr. Ronald Miller are both medical experts who were appointed by the state court to perform medical evaluations during the custody proceedings. Dr. Timm also held joint counseling sessions with Tanner and his father, which, according to Dornheim, violated various ethics codes because, she asserts, a victim should never be required to receive joint counseling with the perpetrator. Dr. Miller performed an Attention Deficit/Hyperactivity Disorder (ADHD) evaluation of Tanner over Dornheim's objections, and he allegedly told Dornheim that his findings had to be consistent with Schmalenberger's conclusions.

Tibbetts commenced divorce proceedings in state court in 1998, and the state district court issued its final order in the divorce proceedings on August 13, 2003, in which it denied Dornheim's motion to modify the judgment concerning visitation. In April 2003, the State of North Dakota filed a deprivation petition in juvenile court concerning Tanner. The juvenile court filed its Order of Disposition in the deprivation proceeding on August 26, 2003, in which it placed legal custody of Tanner with the state but allowed Dornheim to retain physical custody and provided for unsupervised visitations for Tibbetts. Dornheim appealed aspects of both of those proceedings to the Supreme Court of North Dakota, which affirmed the lower court judgments on June 30, 2004.

On August 13, 2003, the Dornheims filed this civil rights lawsuit in federal court, alleging: (1) separate 42 U.S.C. § 1983 claims against Sholes, John Packett as Chief of the Police Department, Kenna, Sele, Slavens, Keith Berger as Director of the Social Services Agency, and Schmalenberger for maliciously and intentionally interfering with their constitutionally-protected rights under the Fourth and Fourteenth Amendments; (2) a 42 U.S.C. § 1985 claim against all defendants for conspiring to violate Dornheim's rights as a custodial parent under the Due Process and Equal Protection clauses; (3) a state-law defamation claim against Kenna; (4) and state-law malpractice claims against Sele, Dr. Timm, and Schmalenberger. The complaint asked for an injunction against the District Court of North Dakota enjoining it from enforcing certain of its orders and enjoining it from making other particular orders. The complaint also sought $3 million in compensatory damages and various amounts of punitive damages against various defendants.

The United States Magistrate Judge, hearing the case by consent of the parties pursuant to 28 U.S.C. § 636(c), dismissed the Dornheims' federal action for lack of

jurisdiction under the Rooker/Feldman[1] doctrine to the extent that the claims were inextricably intertwined with the state court custody and deprivation hearing decisions, finding that the requested injunctive relief under the federal claims would effectively reverse the state court decisions. The court alternatively found that the § 1985 claim failed to state a cognizable claim and that each of the defendants was entitled to either qualified immunity or quasi-judicial immunity on the § 1983 claims and the state-law malpractice claims. The court declined to exercise supplemental jurisdiction over the final state law claim of defamation against Kenna and dismissed that claim without prejudice. The Dornheims appeal the dismissal of the federal claims but do not address the state-law claims in their briefs. We thus decline to address the district court's dismissal of the state-law claims as those issues have been waived. See Neb. Plastics, Inc. v. Holland Colors Ams., Inc., 408 F.3d 410, 421-22 n.5 (8th Cir. 2005).

## II.

### A.     Rooker/Feldman Doctrine

Since the court's ruling, the Supreme Court has confined application of the Rooker/Feldman doctrine to "cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the court proceedings commenced and inviting district court review and rejection of those judgments." Exxon Mobil Corp. v. Saudi Basic Indus., 125 S. Ct. 1517, 1521-22 (2005). The basis for the Rooker/Feldman doctrine is that, other than in the context of habeas claims, federal district courts are courts of original jurisdiction, and by statute they are precluded from serving as appellate courts to review state court judgments, as that appellate function is reserved to the Supreme

---

[1]See D.C. Court of Appeals v. Feldman, 460 U.S. 462 (1983); Rooker v. Fid. Trust Co., 263 U.S. 413 (1923).

Court under 28 U.S.C. § 1257. Id. at 1526. Exxon Mobil makes clear that the Rooker/Feldman doctrine precludes federal district court jurisdiction only if the federal suit is commenced after the state court proceedings have ended. See id. at 1527 ("[N]either Rooker nor Feldman supports the notion that properly invoked concurrent jurisdiction vanishes if a state court reaches judgment on the same or related question while the case remains *sub judice* in a federal court."); see also Mothershed v. Justices of Supreme Court, 410 F.3d 602, 604-05 n.1 (9th Cir. 2005) (determining whether state-court proceedings were complete as the first step of a post-Exxon Mobil Rooker/Feldman analysis). There is no judgment to review if suit is filed in federal district court prior to completion of the state-court action. Rather, "[d]isposition of the federal action, once the state-court adjudication is complete, would be governed by preclusion law." Exxon Mobil, 125 S. Ct. at 1527.

The North Dakota District Court issued its final order in the divorce proceedings on August 13, 2003. The juvenile court filed its Order of Disposition in the deprivation proceeding on August 26, 2003. Dornheim appealed both state-court rulings to the Supreme Court of North Dakota, which affirmed the lower court judgment in each appeal on June 30, 2004. The Dornheims commenced this suit in federal court on August 13, 2003. At the time that the Dornheims commenced this federal action, the state court adjudication was not complete. See Mothershed, 410 F.3d at 604-05 n.1 (noting that the state-court proceeding had ended for Rooker/Feldman purposes when the state supreme court denied the plaintiff's request for a writ of mandamus); Federación de Maestros de Puerto Rico v. Junta de Relaciones del Trabajo de Puerto Rico, 410 F.3d 17, 24 & n.10 (1st Cir. 2005) (concluding that the state proceeding has ended when it becomes appealable under § 1257 because the highest state court has issued its final decision, or when the lower state-court ruling otherwise carries preclusive effect, such as when the parties allow the time for appeal to lapse without filing an appeal in state court). Thus, any effect that the state court rulings might have on this federal action is limited to the application of preclusion law, and the state-court adjudications did not divest the

federal district court of jurisdiction under the <u>Rooker/Feldman</u> doctrine. <u>See</u> <u>Exxon Mobil</u>, 125 S. Ct. at 1527. The court erred in holding that it lacked jurisdiction to consider the Dornheims' claims.

B.      Dismissal of § 1985 Claim for Failure to State a Claim

We turn then to the court's alternative bases for dismissal of the case. We review de novo the district court's dismissal for failure to state a claim, viewing the complaint in the light most favorable to the plaintiff. <u>Federer</u>, 363 F.3d at 757. Dismissal is proper only if the facts so construed still do not entitle the plaintiff to any relief. <u>Id.</u>

"[T]o prove a private conspiracy in violation of . . . § 1985(3), a plaintiff must show, *inter alia*, (1) that some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action, and (2) that the conspiracy aimed at interfering with rights that are protected against private, as well as official, encroachment." <u>Bray v. Alexandria Women's Health Clinic</u>, 506 U.S. 263, 267-68 (1993) (internal citations, marks, and footnotes omitted). The Dornheims assert that women in general, and victims of domestic violence in particular, compose classes subject to invidious discrimination. In <u>Bray</u>, the Supreme Court rejected the assertion that women seeking an abortion composed a class subject to invidious discrimination, noting that the term "class" "unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors." <u>Id.</u> at 269. Similarly, we believe that the term "class" means something more than the group of people who share the common characteristic of being victims of domestic violence. To allow such a group redress under § 1985 "would convert the statute into the 'general federal tort law' it was the very purpose of the animus requirement to avoid." <u>Id.</u>

When "women" is the class sought to be protected in a § 1985(3) claim, the Supreme Court has stated that invidious discrimination "demand[s] . . . at least a purpose that focuses upon women <u>by reason of their sex</u>" giving as an example "the purpose of 'saving' women <u>because they are women</u> from a combative, aggressive profession such as the practice of law." <u>Id.</u> at 270 (emphasis in original). The Supreme Court noted that opposition to abortion does not necessarily indicate animus against women in general. The Court relied on the facts that indigent women seeking an abortion do not comprise a suspect class, and that abortion funding restrictions are subject to rational basis review as opposed to the stricter scrutiny demanded for gender-based discrimination. <u>See</u> <u>id.</u> at 272-73 (citing <u>Maher v. Roe</u>, 432 U.S. 464 (1977), and <u>Harris v. McRae</u>, 448 U.S. 297 (1980)).

The Dornheims direct us to numerous cases recognizing the availability of a § 1983 or equal protection claim for victims of domestic violence. Similar to the analysis in <u>Bray</u>, however, those cases apply a rational basis standard, suggesting that unequal treatment aimed at victims of domestic violence is not based solely on the victim's status as a woman. <u>See</u> <u>Navarro v. Block</u>, 72 F.3d 712, 716-17 (9th Cir. 1995) (noting that a domestic violence/non-domestic violence classification in how a police department categorized 911 emergency calls failed a rationality test). Although victims of domestic violence are most often women, the victims are not exclusively women. <u>See</u> <u>id.</u> at 716 (noting that a policy of treating victims of domestic violence differently than other crime victims is gender-neutral on its face). Thus, discrimination against victims of domestic violence "is not *ipso facto* sex discrimination." <u>Bray</u>, 506 U.S. at 273. The Dornheims have failed to establish that the defendants' actions were directed at Dornheim because she was a woman, and the court properly dismissed the § 1985 claim as the defendants' actions were not motivated by invidious discrimination against a class protected under that statute.

C.    Absolute and Qualified Immunity under § 1983

It is well settled that officials are entitled to absolute immunity from civil rights suits for the performance of duties which are "integral parts of the judicial process" as long as the judicial function was granted immunity under common law at the time § 1983 was enacted.  See Briscoe v. LaHue, 460 U.S. 325, 335 (1983).  The Dornheims have failed to establish that any of the individuals granted absolute immunity was acting outside the scope of his or her role within the judicial process. As such, the court appropriately granted absolute immunity to Slavens as a witness, see id. at 330-34 (holding that § 1983 did not abrogate the absolute immunity available at common law to witnesses, even for perjured testimony); to Schmalenberger as a guardian ad litem, see McCuen v. Polk County, Ia., 893 F.2d 172, 174 (8th Cir. 1990) (holding that a guardian ad litem's absolute immunity extends to her duties of preparing reports and making recommendations to family court); and to Dr. Timm and Dr. Miller for their reporting and counseling functions as court-appointed medical experts, see Morstad v. Dep't of Corr. and Rehab., 147 F.3d 741, 744 (8th Cir. 1998) (holding that a court-appointed psychiatrist "enjoyed absolute immunity for the testimony and reports . . . submitted to the court").

Kenna and Sele were granted qualified immunity related to their work as social workers, and Sholes was granted qualified immunity in connection with claims related to his police work in investigating the allegations of child abuse.  We have long recognized that parents have a liberty interest in familial relationships and have an important substantive due process right to control the care and custody of their children. See Abdouch v. Burger, 426 F.3d 982, 987 (8th Cir. 2005).  However, "[t]he right to family integrity clearly does not include a constitutional right to be free from child abuse investigations," as the state has a strong interest in protecting the safety and welfare of minor children, particularly where protection is considered necessary as against the parents themselves. Manzano v. S.D. Dep't of Soc. Servs., 60 F.3d 505, 510 (8th Cir. 1995) (internal marks omitted).  These competing interests require us to

balance the interests of the state and the children against the interests of the parent in determining whether a constitutional violation has occurred. "[W]hen a state official pursuing a child abuse investigation takes an action which would otherwise unconstitutionally disrupt familial integrity, he or she is entitled to qualified immunity, if such action is properly founded upon a reasonable suspicion of child abuse." Thomason v. SCAN Volunteer Servs., 85 F.3d 1365, 1371 (8th Cir. 1996) (internal marks omitted). The need to weigh a parent's right to familial integrity against the state's interest in protecting the child makes it difficult to overcome a qualified immunity defense in the context of a child abuse investigation. See Abdouch, 426 F.3d at 987.

There is no dispute that the child abuse investigations were warranted. The first investigation was a result of bruises on Tanner's arm. Dornheim and Tibbetts each accused the other of causing the bruises. The second investigation was instigated by Dornheim when she took Tanner to an urgent care clinic complaining of bruises on Tanner's face allegedly caused by his father. All of the allegedly unconstitutional actions by the social workers or the police officers were within the confines of these investigations. The allegations relate primarily to the inadequacy of the investigation–failure to interview or believe particular persons or failure to adequately take into account Tibbetts's criminal record–rather than to specific actions that deprived the Dornheims of their constitutionally protected right to family integrity. Notably, Tanner was never removed from Ms. Dornheim's physical custody. At most, Tanner was subjected to evaluations and therapy sessions against Ms. Dornheim's will. Cf. Abdouch, 426 F.3d at 988 (affirming grant of qualified immunity to social workers who removed child from mother's custody for a seven-month period during child abuse investigation where the mother's and father's roles in the abuse were unclear). On these facts, the Dornheims cannot establish that the social workers or police officers violated any clearly established constitutional rights during the child abuse investigations. See Manzano, 60 F.3d at 510-11.

A Rule 12(b)(6) dismissal based on qualified immunity is appropriate "when the immunity is established on the face of the complaint." Whisman v. Rinehart, 119 F.3d 1303, 1309 (8th Cir. 1997) (quoting Hafley v. Lohman, 90 F.3d 264, 266 (8th Cir.1996)). The complaint alleges actions that all took place within the confines of the investigation. This is not a case where no investigation was done, cf. Whisman, 119 F.3d at 1310 (affirming denial of qualified immunity where child was taken and held with no investigation); rather, the only allegations pertain to the investigation itself. Thus, qualified immunity was properly granted to Kenna, Sele, and Sholes.

Packett and Berger were named in the complaint in their official capacities only. A suit against a governmental employee in his official capacity is treated as a suit against the municipality he serves. Audio Odyssey, Ltd. v. Brenton First Nat. Bank, 245 F.3d 721, 741 (8th Cir. 2001) reinstated by, 286 F.3d 498 (8th Cir.) (en banc), cert. denied, 537 U.S. 990 (2002). In their briefs to this court, the Dornheims did not address the district court's dismissal of Packett or Berger or otherwise discuss the issue of municipality liability. We need not, and do not, address the propriety of the court's dismissal of Packett or Berger as the Dornheims have waived these issues. See Neb. Plastics, Inc., 408 F.3d at 421-22 n.5.

## III.

The district court's judgment dismissing the Dornheims' lawsuit is affirmed.

_____