# United States Court of Appeals
### For the Eighth Circuit

_____

No. 20-1822
_____

Hal W. Stanley and Michelle Stanley, Individually and as Parents and Legal Guardians

*Plaintiffs - Appellants*

v.

Asa Hutchinson, et al

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Western District of Arkansas - Hot Springs

_____

Submitted: April 13, 2021
Filed: September 8, 2021

_____

Before LOKEN, WOLLMAN, and STRAS, Circuit Judges.

_____

LOKEN, Circuit Judge.

On January 12, 2015, child abuse investigators removed seven minor children from the private home of their parents, Hal and Michelle Stanley, in Hot Springs, Arkansas. After extensive state administrative and judicial proceedings, the Stanleys filed this 42 U.S.C. § 1983 action asserting a variety of claims against the Governor of Arkansas; the Arkansas Department of Human Services (DHS); Garland County; and numerous employees of the State and Garland County in their official and

individual capacities. The State defendants moved to dismiss plaintiffs' official capacity claims and to dismiss the individual capacity claims based on qualified immunity. The district court[1] dismissed the official capacity claims and granted qualified immunity on all individual capacity claims but one, the claim that Katherine Finnegan, an investigator for the Crimes Against Children Division (CACD) of the Arkansas State Police, removed the Stanleys' minor children from their home without reasonable suspicion of child abuse. Finnegan appealed that ruling. Reviewing *de novo*, we affirmed. Stanley v. Finnegan (Stanley I), 899 F.3d 623 (8th Cir. 2018).

On remand, after discovery closed, the remaining defendants -- Finnegan and the Garland County defendants -- moved for summary judgment on the remaining claims. The Stanleys moved for partial summary judgment. The district court[2] granted defendants' motions and dismissed all claims with prejudice. The Stanleys appeal, identifying as Orders Being Appealed the dismissal order granting qualified immunity to Finnegan on claims other than reasonable suspicion of child abuse, and the summary judgment order in favor of Sergeant Mike Wright and Corporal Terry Threadgill of the Garland County Sheriff's Department and Finnegan.[3]

---

[1]The Honorable P.K. Holmes, III, Chief Judge of the United States District Court for the Western District of Arkansas.

[2]The Honorable Robert T. Dawson, United State District Judge for the Western District of Arkansas.

[3]The Notice of Appeal also names the district court's dismissal of Major Ron Slayton, then Commander of the CACD, for failure to state a claim. However, no claim against Slayton was properly preserved. The argument on appeal is based on deposition testimony by Finnegan long after Slayton was dismissed. The Stanleys did not move to amend their complaint and reopen their claim against Slayton based on evidence supporting a theory that was not initially pleaded. Nor did they include Slayton in their partial motion for summary judgment, or argue on appeal the district court erred in granting a Rule 12(b)(6) dismissal.

Our review of summary judgment based on qualified immunity considers the evidence in the light most favorable to the plaintiffs to determine whether the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Qualified immunity protects public officials from § 1983 damages actions if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. To determine whether a defendant is entitled to dismissal on the basis of qualified immunity, we consider (1) whether the official's conduct violated a constitutional right; and (2) whether the violated right was clearly established." Stanley I, 899 F.3d at 626-27 (citations omitted; cleaned up). At issue here are due process and Fourth Amendment rights of the parents and the children.[4] Reviewing both the dismissal and summary judgment orders *de novo*, we affirm. Helvey v. City of Maplewood, 154 F.3d 841, 844 (8th Cir. 1998) (standard of review).

In briefing the various claims resolved by the district court on the expanded summary judgment record, the Stanleys generally follow the Complaint in separating their claims into two time frames -- the initial warrant search and removal of the children from their home, and the subsequent administrative and judicial proceedings that resulted in extended state custody of their children for months beyond the initial 72-hours authorized by the Arkansas Child Maltreatment Act. See Ark. Code Ann. § 12-18-1001(b). We will do likewise, but we add legal standards and precedents that govern each distinct § 1983 claim to cabin the Stanleys' unorganized stream of conclusory assertions of intentional misconduct by all defendants.

---

[4]On appeal, the Stanleys' Briefs do not separately argue that the district court erred in dismissing procedural due process and First Amendment claims. Likewise, the Stanleys do not argue on appeal that the court erred in dismissing official capacity claims against the individual defendants and Monell claims against Garland County. Accordingly, those claims are abandoned. See Fed. R. App. P. 28(a)(5) and (8). We consider only substantive due process and Fourth Amendment claims against Finnegan, Wright, and Threadgill.

# I. The Initial Removal.

The background facts and removal allegations in the Stanleys' forty-seven-page Complaint are set forth in our prior opinion. See Stanley I, 899 F.3d at 625-26. We now recount the summary judgment record as further developed in discovery. At the time in question, the Stanley household consisted of Hal, Michelle, and their seven minor children. The eldest son at home, sixteen-year-old Jonathan, wanted to attend public school instead of continuing to receive Christian home-schooling. Hal refused. In December 2014, prompted by Jonathan, a neighbor reported the Stanleys to the child abuse hotline for inadequate clothing and physical abuse by Hal. A DHS investigator determined the allegations were "unsubstantiated" after speaking with the family. See Ark. Code § 12-18-702(a)(1)(A).

On January 9, 2015, two complainants, relaying information provided by Jonathan, reported allegations of abuse and neglect within the Stanley home to Sergeant Wright of the Sheriff's Department and Arkansas State Police investigator Russell Rhodes. The primary allegation was that Hal tried to force his children to drink an "industrial grade" sodium-chlorite solution known as Miracle Mineral Supplement ("MMS"), which could cause nausea, vomiting, diarrhea, and symptoms of acute liver failure. When the children refused to drink MMS, the complainants alleged, Hal diffused MMS through the home's ventilation system into the children's school room. Hal kept a container of MMS in the family's refrigerator where it could seep into food. The complainants also reported excessive corporal punishment, medical and educational neglect, and inadequate nutrition.

After speaking with the complainants, Wright and Rhodes interviewed Christopher, an adult son who had recently moved out of the home but still visited. Christopher confirmed that Hal "experimented" with MMS but denied that he forced the children to drink it. Christopher said his father had diffused MMS through the ventilation system but stopped after Christopher protested. Christopher expressed

concern about his younger siblings' education and health. On January 11, Wright spoke to a former sheriff of Lonoke County, who expressed concerns about the Stanley household based on what he heard from Madelyn, the eldest adult child now staying with the former sheriff. On January 12, Jonathan provided the two complainants a plastic bottle containing a bleach-like liquid identified as MMS, which they delivered to Sergeant Wright. Hand-written notes, allegedly written by two Stanley children, accompanied the bottle, echoing Jonathan's claims of physical and mental neglect.

Alerted by the Sheriff's Department, the CACD began a child abuse investigation of poisonous substances, assigning Finnegan to investigate. After meeting with Finnegan and other officers, Sergeant Wright applied for a warrant to search the Stanley residence for MMS "and any other evidence related to the crime of Endangering Welfare of A Minor . . . in violation of Arkansas State Statute 5-27-205." The Affidavit recited that the CACD "has opened an investigation and intends to remove the children from the home to have them examined by a medical doctor." A Garland County Circuit Court Judge issued a warrant to search "for the property specified." The warrant made no reference to removing the children.

Later that afternoon, a team of thirty government agents executed the warrant. Sergeant Wright oversaw the criminal investigation while investigator Finnegan oversaw the civil child maltreatment investigation. Upon entering the home, Sergeant Wright smelled bleach and experienced a tingling sensation in his lips and a scratchy throat. Finnegan suffered a headache and a raw throat the next day. Sergeant Wright, Corporal Threadgill, and Finnegan searched the house for MMS. In the refrigerator, they found a gallon bottle labeled "Hydrogen Peroxide 35%," an empty Cool Whip container labeled "Sodium Chlorite 2/24/14," and a bottle labeled "Hydrogen Peroxide Solution" and "CDH." In the bathroom, officers found a dropper bottle marked "MMS."

Finnegan interviewed the two oldest minor children, Jonathan and fourteen-year-old V.S. Jonathan alleged child abuse events during the past two years -- Hal excessively using a paddle and choking, and using MMS to remove a mole on a younger child, C.S., which caused a chemical burn, and to cure C.S.'s illness, causing her to throw up. Like Christopher, V.S. said their father did not force them to drink MMS but strongly encouraged it. Both said if the children remained at the home, their parents planned to flee immediately to another location. Finnegan inspected the family van. It was packed with boxes, clothes, and tents, which she believed were for the purpose of flight. Finnegan interviewed the five youngest children. P.S. stated she smelled MMS in the home and had been punished with a paddle in the past. C.S. said the smell of MMS bothered her and, "in the school room, they have to open the doors and turn on the fan so they can breathe." Finnegan did not interview Hal and Michelle. Dr. Patrick Kennedy inspected the children in an ambulance, finding no immediate indication of exposure to toxic substances, burns, bruises, or malnutrition. Dr. Kennedy recommended that an off-site doctor examine the children to determine the effects of MMS. No evidence suggesting physical abuse was found.

Finnegan asked the State DHS to determine whether the children could safely remain in the home. Lenny Robinson arrived to conduct a DHS safety assessment which he failed to complete. Finnegan's CACD supervisor, Detective Michelle Gatlin, spoke with Dr. Teresa Esquivel who conferred with Poison Control and advised that MMS is a very poisonous substance and the children should not remain in the home if MMS is present. Finnegan conveyed the results of her interviews and the recommendations of Dr. Kennedy and Dr. Esquivel to Sergeant Wright. When "it became apparent that DHS was not going to remove the children," Wright exercised his statutory authority as a "law enforcement" officer to have the children placed in 72-hour DHS protective custody pursuant to the Maltreatment Act. See Ark. Code Ann. § 12-18-1001. He based this decision on the substantial risk of serious harm to the children from exposure to dangerous chemicals, excessive discipline, and the threat of flight or retaliation.

On appeal, the Stanleys challenge the district court's conclusion that Sergeant Wright and Investigator Finnegan did not violate the family's clearly established constitutional rights in removing the children to DHS protective custody at the end of the five-hour warrant search. In addition to not defining precisely what rights were violated under what prevailing standards of law, the Stanleys ignore *controlling law of the case* established in Stanley I:

> As the district court recognized, it is clearly established that the *removal of children from their parents' custody violates a constitutional right if the removal occurs without reasonable suspicion of child abuse.* See Heartland Acad. Cmty. Church v. Waddle, 427 F.3d 525, 534 (8th Cir. 2005); Abdouch v. Burger, 426 F.3d 982, 987 (8th Cir. 2005). "Parents have a liberty interest in the care, custody, and management of their children," but this interest is "limited by the state's compelling interest in protecting a child . . . ." Swipies v. Kofka, 348 F.3d 701, 703 (8th Cir. 2003). To balance these competing interests, we have adopted the rule that, "*when a state official pursuing a child abuse investigation takes an action which would otherwise unconstitutionally disrupt familial integrity, he or she is entitled to qualified immunity, if such action is properly founded upon a reasonable suspicion of child abuse.*" Id., citing Manzano v. S.D. Dep't of Soc. Servs., 60 F.3d 505, 510-11 (8th Cir. 1995). Thus, the issue is whether the allegations in the Stanleys' Complaint, taken as true and viewed in their favor, state a plausible claim that Finnegan lacked reasonable suspicion of child abuse when she participated in removing the Stanleys' minor children from the home and custody of their parents.

899 F.3d at 827 (emphasis added). Thus, the issue in reviewing the grant of summary judgment dismissing the Stanleys' removal claims is whether the Stanleys' "liberty interest in the care, custody, and management of their children" was violated because Wright and Finnegan lacked reasonable suspicion of child abuse when the children were removed from the Stanley home. "[A] balancing test which weighs the interest

of the parent against the interests of the child and the state makes the qualified immunity defense difficult to overcome." Manzano, 60 F.3d at 510.

Reasonable suspicion "must be determined by analyzing the totality of the circumstances at the time of the removal." Stanley I, 899 F.3d at 629. "The liberty interest in familial relations is limited by the compelling government interest in protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves." Myers v. Morris, 810 F.2d 1437, 1462 (8th Cir.), cert. denied, 484 U.S. 828 (1987). Later-developed facts and later-acquired knowledge are relevant only to the Stanleys' post-removal claims, which we discuss in Part II. As the Third Circuit noted in Croft v. Westmoreland County Children & Youth Services, "We realize there may be cases in which a child services bureau may be justified in removing either a child or parent from the home, even where later investigation proves no abuse occurred." 103 F.3d 1123, 1126 (3rd Cir. 1997).

Sergeant Wright obtained a warrant to search for MMS and other evidence of child abuse after investigating third party complaints of child abuse in the Stanley household, including allegations the father subjected his minor children to a potentially toxic and poisonous substance "similar to industrial-grade bleach." When Wright and Finnegan executed the warrant, they smelled "bleach." Officers found containers for "sodium-chlorite" and "MMS" where the complainants said they would be and a dropper bottle marked "MMS" in the bathroom. Finnegan interviewed the children. Two teenagers confirmed that Hal exposed the children to MMS. A younger child said that, due to the smell of MMS, "they have to open the doors and turn on the fan [in the school room] so they can breathe." Two younger children said their parents planned to flee if the children were left in the home, which Finnegan's personal inspection of the family vehicle tended to confirm. A CADC supervisor called Dr. Esquivel, who advised that MMS is a poisonous substance and the children should not remain in the home if MMS is present. Dr. Kennedy examined the

-8-

younger children and found no obvious signs of abuse but recommended off-site medical examinations to determine the effects of MMS. Having gathered this information and determined that DHS would not take action, Sergeant Wright exercised his statutory authority as a law enforcement officer to have the children removed to DHS custody under a 72-hour protective hold where the children could be given a more thorough medical examination for MMS exposure or other abuse. The district court concluded: "Based on these undisputed facts, a reasonable suspicion of child abuse existed when the children were removed. . . . Accordingly, Wright and Finnegan are entitled to qualified immunity as to the removal of the children." We agree. See Thomason v. SCAN Volunteer Servs., Inc., 85 F.3d 1365, 1373 & n.6 (8th Cir. 1996).

The Stanleys argue the officers unreasonably relied on Jonathan's unsubstantiated and bizarre allegations of Hal piping MMS fumes and allowing the chemical to seep into food. They argue MMS is a legal chemical and the officers had no evidence it is harmful or the children ingested it. Ignoring what interviews of four children confirmed, they argue that "if there had been a chemical in the Stanley home that was causing irritation . . . such a fact might support reasonable suspicion, which is why Wright, Threadgill, and Finnegan concocted the bleach smell and physical symptoms unrelated to MMS exposure." Nothing in the record supports their assertion that the officers fabricated evidence to justify their "premeditated" decision to seize the children. "[M]ore than the mere recitation of an improper state of mind such as malice, bad faith, retaliatory motive or conspiracy is required to defeat qualified immunity . . . by a defendant otherwise entitled to that defense." Myers, 810 F.2d at 1453.

The Stanleys emphasize that none of the children exhibited symptoms of poisoning during the warrant search, and that MMS is a "legal" substance that has been promoted "as a remedy for the simple cold" and other ailments. True enough. But federal agencies have warned MMS is dangerous if ingested. In this day and age,

-9-

when scientists and government investigators have discovered long-term adverse health effects from inhaling cigarette smoke, asbestos fumes, and other legal products, child abuse officials should not be held liable in damages for determining that short-term protective custody is needed to determine whether parents have exposed their minor children to serious health risks that may not be immediately apparent. The district court did not err in concluding that the children were removed based on reasonable suspicion of child abuse and therefore Wright, Finnegan, and Threadgill are entitled to qualified immunity. See Manzano, 60 F.3d at 511. The Stanleys' contrary contentions bring to mind the Supreme Court's observation in DeShaney v. Winnebago County Department of Social Services: "In defense of [the child abuse investigators] it must also be said that had they moved too soon to take custody of the son away from the father, they would likely have been met with charges of improperly intruding into the parent-child relationship, charges based on the same Due Process Clause that forms the basis for the present charge of failure to provide adequate protection." 489 U.S. 189, 203 (1989).

The Stanleys further argue that the children's removal violated their Fourth Amendment right to be free from unreasonable searches and seizures because the officials did not have probable cause to seize the children. We have never held that children have a Fourth Amendment right not to be separated from their parents absent probable cause to believe the parents are guilty of child abuse. See, e.g., Swipies, 348 F.3d at 703-04 (discussing only the "parental liberty interest"). Although we stated in Stanley I that Fourth Amendment standards "properly framed" the issue, 899 F.3d at 628, we held that reasonable suspicion is the governing standard in this situation. The Fourth Amendment protects against *unreasonable* searches and seizures. "[S]eizing a child who may be the victim of abuse presents a different Fourth Amendment dynamic than seizing an individual suspected of criminal wrongdoing. In the latter case, the government seizes the individual in order to keep that individual from harming others, while in the former case, the child is seized to keep others from harming him." Gates v. Tex. Dep't of Protective and Reg. Servs., 537 F.3d 404, 427-

28 (5th Cir. 2008). As the Supreme Court noted in Stanley v. Illinois, 405 U.S. 645, 653 (1972), "We do not question the assertion that neglectful parents may be separated from their children."

In considering whether the Fourth Amendment applies when children are separated from parents suspected of child abuse or neglect, our sister circuits have not fully agreed on whether reasonable suspicion, exigent circumstances, or probable cause is required. See, e.g., the majority and dissenting opinions in Kovacic v. Cuyahoga Cnty Dep't of Child. & Family Servs., 724 F.3d 687, 699 & n.5 (6th Cir. 2013), cert. denied sub nom. Campbell-Postingle v. Kovacic, 572 U.S. 1149 (2014); Doe v. Dist. of Columbia, 796 F.3d 96, 104 (D.C. Cir. 2015) (collecting cases). The Ninth Circuit has said that the tests under the Fourth and Fourteenth Amendments "are equivalent." Kirkpatrick v. City of Washoe, 843 F.3d 784, 789 (9th Cir. 2016) (en banc). These decisions appear to agree that the Fourth Amendment is not violated when officers seize a child without a warrant or a court order if exigent circumstances exist. Here, the district court concluded that "the undisputed material facts establish the presence of exigent circumstances on the night the children were removed" -- allegations of MMS exposure that Dr. Esquivel advised could cause serious health issues and the children reporting the family would flee if the children were not immediately removed. We agree.

We have held that the Fourth Amendment may be violated if government officials separate children from a parent or from a school where they were living without either a court order or probable cause to believe the children's welfare was in danger. See Heartland, 427 F.3d at 533, followed in Riehm v. Engelking, 538 F.3d 952, 965 (8th Cir. 2008). Neither case involved child abuse officers placing children in protective custody after a warrant search of their home. In Riehm, 538 F.3d at 965, we upheld the seizure, concluding probable cause existed, whereas in Heartland, 427 F.3d at 533, we held that the seizures were unreasonable "because there was neither probable cause nor exigent circumstances to justify the taking" without a court order.

Here, the district court upheld removal applying the Heartland exigent circumstances standard. Moreover, the removal was ordered in executing a warrant issued by a magistrate who was advised removal was intended. Finally, even if the Fourth Amendment applies in this situation, an issue we do not decide, the defendants are entitled to qualified immunity because it was not clearly established in the Eighth Circuit when the Stanley children were removed from their home. See Dist. of Columbia v. Wesby, --- U.S. ---, 138 S. Ct. 577, 589-90 (2018) ("To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent" so that "every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.").

## II. Post Removal Proceedings.

Judicial Proceedings. On January 16, the day after the children were taken into protective custody, they were observed by medical professionals, who did not find signs of toxicity. That day, the DHS filed a petition for emergency custody and dependency-neglect in the circuit court of Garland County, Arkansas, seeking continued custody. See Ark. Code §§ 9-27-303(17), 9-27-306(a)(1)(C), 9-27-310(b)(2). The petition was supported by affidavits of Finnegan, Wright, and a Family Service Worker Supervisor, as well as a two-page letter from Dr. Esquivel. The juvenile court issued an ex parte order for emergency custody, finding "probable cause to believe that the juveniles are dependent-neglected" and that "[i]mmediate removal of the juveniles from [their parents] is in the best interest of the juveniles and is necessary to protect [their] health and safety." After a hearing at which Hal and Michelle testified, the court entered a probable cause order finding that "the Arkansas Department of Human Services has met its burden by a preponderance of the evidence and finds that there was probable cause and emergency conditions which necessitated removal of the juveniles from the custody of the mother and father and finds that probable cause continues to exist." The children were placed in foster care. On March 23, the court entered an Adjudication and Disposition Order continuing

DHS custody pursuant to a compromise agreement providing for trial home visits and parental visitation. On June 24, the court entered an Order Returning Custody to Parents and Agreed Closure Order noting that four children successfully returned to the Stanley home in May and returning custody of the other three to their parents.

Administrative Proceedings. On March 6, 2015, CACD entered administrative findings of child maltreatment against Hal and Michelle for exposing the children to poisonous and noxious substances and educational neglect, based on investigator Finnegan's "find true" determinations. See Ark. Code Ann. § 12-18-702(2)(A). The Stanleys appealed to the DHS Office of Appeals and Hearings. In February 2016, the hearing officer upheld the educational neglect allegations but unsubstantiated the poisonous and noxious substance exposure and physical abuse allegations, finding Jonathan and V.S.'s statements unreliable. After the Stanleys appealed the educational neglect finding, a hearing was set, and CACD advised it would not defend the "true" determination. The OAH then issued a Final Order changing the findings against the Stanleys to unsubstantiated, meaning they would not be listed on the Arkansas Child Maltreatment Central Registry. In her deposition, Finnegan testified that, when she prepared her "find true" determination, she doubted having enough evidence to sustain it, but Major Slayton told her to find true even without an evidentiary basis, because the case was "too political."

On appeal, the Stanleys argue that Finnegan violated their rights to due process by fabricating evidence -- "find true" child maltreatment allegations she knew could not be substantiated -- and giving perjured testimony first at the probable cause judicial hearing one week after the removal and later during administrative proceedings. In rejecting these claims, the district court concluded that "Finnegan's [find true] admissions reflect poorly upon CACD and its investigators [but] do not provide a basis for liability" because "whether the children should have remained in DHS custody rested with the sufficiency of the family court's judicial proceedings." We agree.

-13-

Finnegan's decision to "find true" did not impact the Stanleys' familial integrity. After removal, custody of the children taken into 72-hour protective hold was immediately determined by the state court, and the Stanleys failed to rebut the presumption of regularity attending judicial proceedings that determined DHS custody of the children should be extended after the initial post-removal confirmation. See Southerland v. City of New York., 680 F.3d 127, 154-55 (2d Cir. 2012), cert. denied, 568 U.S. 1150 (2013). The true findings may have initiated the administrative hearings regarding alleged child abuse, but this was a prosecutorial decision meriting absolute immunity. See Thomason, 85 F.3d at 1373. Finnegan is also entitled to absolute immunity for her testimony before the state court, regardless of the allegations of perjury. See Myers v. Bull, 599 F.2d 863, 866 (8th Cir.), cert. denied, 444 U.S. 901 (1979). The Stanleys rely on White v. Smith, 696 F.3d 740, 754 (8th Cir. 2012), as reaffirmed in Dean v. Searcy, 893 F.3d 504, 518-19 (8th Cir. 2018), cert. denied, 139 S. Ct. 1291 (2019), for their claim that fabricating evidence and perjury can violate a victim's substantive due process rights. But these cases arose out of a criminal conviction in which law enforcement officers "systematically and intentionally coached witnesses into providing false testimony." White, 696 F.3d at 754. The Stanleys introduced no evidence that Finnegan's find true determination and testimony in administrative and judicial proceedings were "fabricated" or came anywhere near this level of conscience-shocking behavior. At a minimum, qualified immunity is warranted.

### III. Conclusion.

Without question, the Stanley family suffered emotional pain and disruption during a lengthy ordeal that may have been caused, at least in part, by overzealous government officials who were hostile to or skeptical of parents who home-schooled their children in an isolated, religion-dominated environment. But child protection and family integrity issues often require government officials to weigh conflicting interests in situations when immediate protective action may be necessary. Thus, the

-14-

defense of qualified immunity to federal § 1983 claims is properly difficult to overcome. After thorough review of the record, we agree with the district court that the Stanleys failed to overcome the defense. Accordingly, the judgment of the district court is affirmed.

_____