# United States Court of Appeals

## For the Eighth Circuit

_____

No. 11-3291

_____

Carroll T. White, as Personal Representative of the Estate of Joseph White, deceased

*Plaintiff - Appellee*

Kathleen A. Gonzalez

*Plaintiff*

v.

Richard T. Smith, in his official capacity

*Defendant*

Burdette Searcey, Dep., in his official and individual capacities; Gerald Lamkin, Dep., in his official and individual capacities; Jerry O. Dewitt, Sheriff, in his official and individual capacities; Wayne R. Price, PhD, in his official and individual capacities

*Defendants - Appellants*

County of Gage, Nebraska, a Nebraska political subdivision

*Defendant*

_____

Appeal from United States District Court
for the District of Nebraska - Lincoln

_____

Submitted: May 15, 2012
Filed: October 15, 2012

_____

Before MURPHY, BENTON, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

In 1989, Plaintiff Joseph White was convicted by a Nebraska jury of felony murder in the February 1985 rape and murder of Helen Wilson in Beatrice, Nebraska. The prosecution's case against White was based primarily on the testimony and confessions of White's co-defendants, Ada JoAnn Taylor, Thomas W. Winslow, James L. Dean, Kathleen A. Gonzalez, and Debra Shelden. White was sentenced to life in prison without parole and served eighteen years in prison. In 2008, DNA testing established that semen and blood found at the crime scene was left by Bruce Allen Smith, who had no connection to White or the other defendants. A reinvestigation of the case determined that Bruce Allen Smith committed the crime by himself. White's conviction was overturned, he was released from prison, his record of rape and murder was expunged, and pardons were granted to Winslow, Taylor, Dean, Gonzalez, and Deb Shelden.

White filed an action under 42 U.S.C. § 1983 against the members of the Gage County Sheriff's Office (GCSO) (collectively "Defendants") and the various state entities involved in the investigation and prosecution of the Wilson murder.[1] White alleged that Defendants violated his due process rights under the Fifth and Fourteenth Amendments by conspiring to manufacture evidence and obtain false testimony against him. Defendants sought summary judgment on the basis of qualified immunity. The district court[2] denied Defendants' motion, and Defendants now appeal. We affirm.

_____

[1]White died after filing suit, and his father, Carroll White, has revived the action in his son's name as the personal representative of White's estate. References to "White" in this opinion are to Joseph White.

[2]The Honorable Warren K. Urbom, United States District Judge for the District of Nebraska.

-2-

# I. Background[3]

On February 6, 1985, the body of Helen Wilson was discovered in her apartment in Beatrice, Nebraska. An autopsy revealed that she had been raped and suffocated to death. The evidence also indicated that there had been a vicious struggle between Wilson and her assailant (or assailants) in Wilson's bedroom. The Beatrice Police Department (BPD) began investigating with the aid of an FBI "offender profile" that opined that the crime was likely "committed by one individual acting alone." The BPD also believed that the crime was not motivated by robbery because Wilson's jewelry, checks, money market certificates, and over $1,000 in cash were left in the apartment. A forensic analysis of blood, semen, and hairs found at the crime scene determined that the attacker possessed type-B blood and was a "non-secretor" of type-B blood group substances in his semen. In March 1985, the BPD focused its investigation on Bruce Allen Smith and obtained blood and hair samples from him for testing. However, a lab technician erroneously informed the investigators that Bruce Allen Smith appeared to be a "secretor," and the BPD therefore ruled out Bruce Allen Smith as a viable suspect in the Wilson homicide. The BPD failed to arrest anyone in the case.

Burdette Searcey was a former investigator with the BPD from 1977 to 1982 who was working as a farmer at the time of Wilson's murder. Shortly after the murder, Searcey grew interested in the case and offered his services as a private investigator to Wilson's daughter, who accepted. Searcey then began an independent investigation, interviewing persons who frequented the area where the Wilson homicide occurred. Searcey identified a number of persons of interest in the case, including White (also known as "Lobo"), Taylor, Winslow, Debra Brown (later Shelden), and Cliff Shelden. Searcey's theory of the case was that Wilson was murdered by multiple persons, including White, Taylor, and Winslow.

---

[3]A more thorough development of the facts of this case may be found in the "Background" section prepared by the district court. (See Dist. Ct. Op. 6-66).

In 1987, Jerry DeWitt became sheriff of Gage County and hired Searcey as a deputy sheriff. DeWitt and then-county attorney Richard Smith held a series of meetings regarding Searcey's previous independent investigative efforts. In January 1989, DeWitt and Richard Smith authorized Searcey to commence an official investigation of the Wilson homicide. Searcey was joined in his efforts by Gerald Lamkin and Wayne Price.

In 1989, Searcey transcribed his findings from his independent investigation in 1985. According to these notes, Searcey spoke to Lisa Podendorf on April 7, 1985. Podendorf told Searcey that Taylor admitted, on the morning after the murder, that she and White were involved in the Wilson homicide. Podendorf claimed that Taylor's confession came between 7:30 and 8:00 a.m. on February 6, 1985, after Podendorf and Taylor saw police cars outside Wilson's apartment building. However, Searcey was aware that Wilson's body was not discovered until approximately 9:00 a.m. Searcey recorded a statement from Podendorf in January 1989 in which Podendorf again claimed that Taylor admitted her involvement in the crime. Although Podendorf apparently made no mention of it in 1985, she claimed in her 1989 statement that she saw Taylor, Winslow, White, and Beth Johnson get out of a car near Wilson's apartment on the night of the murder.

Searcey next interviewed Winslow, with whom he had previously spoken in 1985. Winslow told Searcey in 1985 that he had been at work on the night of the murder. Searcey later determined that Winslow did not show up to work on the night of February 6, 1985. Searcey again interrogated Winslow on February 13, 1989, while Winslow was in custody for an unrelated assault. According to Winslow, Searcey convinced him that his car had been seen in the area around Wilson's apartment and mentioned that Taylor and White were involved. In his recorded statement, Winslow told Searcey that he loaned his car, a green and brown Oldsmobile, to Taylor, White, and Cliff Shelden on the night of the murder but did

not see them for the rest of evening. Cliff Shelden was in the hospital on the night of the murder and Searcey omitted Winslow's reference to Cliff in his written report.

On February 25, 1989, Searcey interviewed Taylor's former roommate, Charlotte Bishop. Bishop stated that Taylor confessed her involvement in Wilson's murder during a conversation in their apartment on the day after the crime. In Bishop's account, Taylor did not implicate anyone else. The transcript of the interview reveals that Bishop actually remembered very little about the Wilson murder. She could not remember the month or year of the crime, and recalled seeing police cars around Wilson's apartment on the night of the murder, which was factually inaccurate. Moreover, BPD Officer Sam Stevens recalled that Bishop and Taylor had been evicted from their apartment on the day before the murder, making the conversation described by Bishop impossible. Bishop also described an unrelated incident in which Taylor "filled [Bishop's] bathtub with scalding hot water and threw [Bishop] in it." Despite the inaccuracies, Searcey subsequently used Bishop's statement when confronting Taylor about her involvement in the murder.

On March 14, 1989, Searcey prepared a sworn affidavit for an arrest warrant for Taylor and White. That same day, Searcey, DeWitt, and Richard Smith interviewed Winslow again to take a statement from him. Winslow initially stated that he, Taylor, White, and Beth Johnson went to Wilson's apartment, knocked on her door, and left when Wilson did not answer. He claimed that White and Taylor then borrowed his car to commit the crime later that evening. However, after a 44-minute break in which Winslow spoke with his attorney, the interview resumed and Winslow changed his story. Winslow then admitted that he was present during the actual murder and witnessed White and Taylor attacking Wilson. Winslow denied playing an active role in the crime, insisting that he panicked and fled the scene with Beth Johnson.

White was arrested in Alabama at his parents' house the following day. He was interrogated by Searcey, Price, and Stevens just after midnight on March 16, 1989.

A transcript of this interrogation reveals that White consistently denied any knowledge of or involvement in Wilson's murder. When Searcey told White that physical evidence and witnesses placed him at the scene of the crime, White stated that these individuals were lying. When the officers asked White if he would be willing to give hair, saliva, and blood samples for testing, White readily agreed. He also volunteered to give hand and finger prints and to take a polygraph test to prove that he was telling the truth. During the interrogation, White asked to see a lawyer on three separate occasions before Searcey finally stopped questioning him. White ultimately waived extradition and agreed to return to Nebraska to "get [his] name cleared."

Later that day, Searcey and Stevens arrested Taylor in North Carolina. Searcey and Stevens took a statement from Taylor, who confessed to being present at the Wilson murder with White and "another boy" she could not identify. However, Taylor indicated that she only made this admission because North Carolina police officers and Searcey had already convinced her that she must have been present. A transcript of Taylor's interrogation reveals that Taylor then recited a bizarre narrative of the murder that contradicted much of the established evidence.[4] For example, Taylor stated that: White was going to do yard work at Wilson's house on the day of the murder (despite the fact that it was early February); the murder occurred between 5:30 and 7:00 p.m. (the evidence indicated that Wilson was attacked between 9:45 p.m. and midnight); the murder occurred in a light-colored, one-story house (Wilson lived in an apartment complex); and Wilson did not inflict any wounds on her attackers (blood that was not Wilson's blood type was found on the bedding and the wall in Wilson's bedroom).[5] Major discrepancies were also reflected in Taylor's

---

[4]Many of Taylor's statements also demonstrated a strained grip on reality. At one point in the interview, Taylor admitted that she had once believed White was her father, despite the fact that White was only one year older than her.

[5]Taylor's statement also conflicted with Podendorf's supposed recollection of seeing Taylor get out of Winslow's car, which Searcey knew to be a brown and green

initial statement to the Buncombe County, North Carolina Sheriff's Department. In that statement, taken a day before her March 16 interview, Taylor claimed that White repeatedly stabbed Wilson in the body and shoulder while simultaneously raping her and that "she could still shut her eyes and see the blood, the stab wounds, and each of [White and the unidentified man] taking turns raping this lady." The only knife wounds suffered by Wilson were defensive cuts on her hands.

After a 19-minute break in the recording for Taylor to "get a chance to refresh [her]self," Taylor began giving testimony that was more in line with the evidence at the scene of the crime. She suddenly remembered details, conversations, and individuals she could not recall prior to the break, including her "confessions" to Podendorf and Bishop. She also recalled that Wilson lived in an apartment building and that the car she rode in with White was brown and green. The transcript reveals a number of questions in which Searcey offered a suggestion or proposition and Taylor quickly agreed to it while offering little or no further corroboration. For instance, after repeatedly stating that she, White, and an unidentified male were the only ones involved in the homicide, Taylor suddenly agreed with Searcey that "[t]here could have been" another woman present and further agreed with Searcey's suggestion that her name was Beth. After several leading questions from Searcey, Taylor also agreed that White often performed a "trick" in which he tore currency in half and that he had done this after the murder with a five-dollar bill from Wilson's purse.[6]

_____

Oldsmobile. Taylor explained that the group drove to Wilson's house in a "light blue small car."

[6]Early in Searcey's investigation, Searcey was informed by a BPD officer that one-half of a five-dollar bill was found in Wilson's apartment after the murder. As a result, Searcey asked almost every suspect and potential witness whether they recalled White performing a trick in which he tore a dollar bill in half.

Taylor initially stated that she was forced to watch White and "[t]he other boy" rape Wilson, but when Searcey asked her whether it was "a normal sexual act," Taylor said she could not remember any details. After the break in the recording, Searcey again asked Taylor about the nature of the rape, and this time, Taylor stated that "[i]t wasn't normal. It was bisexual . . . . [t]hrough the anal [sic]." This second statement was more in line with the forensic evidence, which indicated that Wilson had been raped both vaginally and anally. Taylor was interviewed again on March 17, the following day. During her first interview with Searcey, Taylor had stated that White had threatened her into taking part in the murder, and she repeatedly expressed a fear that White would harm her or her daughter. However, in the second interview, after viewing a photograph of Winslow, Taylor was able to identify the other man in Wilson's apartment as Winslow and stated that it was Winslow who had threatened her and who she feared. Despite her earlier inability to recall any injury to Wilson's assailants, Taylor stated in the second interview that one of the men had a bloody nose. Taylor also stated in both interviews that White had intended to rob Wilson and had taken money from Wilson's purse. However, this conflicted with the fact that a substantial amount of cash in Wilson's apartment was left untouched. Throughout this second interview and in subsequent interrogations of Taylor, Defendants used Taylor's initial confession and the threat of the death penalty to convince Taylor to cooperate when she could not supply them with the desired testimony or became hesitant about admitting her involvement in various aspects of the crime.

After Taylor "identified" Winslow as being present, Searcey drafted an affidavit for an arrest warrant of Winslow. After Winslow was taken into custody, he asked to see Searcey and recanted his previous statement about witnessing the murder. During their conversation, Winslow repeatedly stated that he had lied about being present at the murder. When Searcey reacted with skepticism, Winslow attempted to place the blame solely on Taylor, White, and Beth Johnson. Searcey responded by confronting Winslow about his various lies prior to being arrested. The conversation ended as follows:

Searcey: Well Tom I'll tell you what I'm going to do. I'm gonna take this okay and I'll legitimately try to see what I can do with it is that fair enough?

Winslow: That's fair. I feel . . .

Searcey: Either way I have the right to prove that your [sic] involved and I have to prove it that way and if I can prove that your [sic] innocent I was to do that also okay? That's my job . . .

Winslow: I wasn't there.

Searcey: We can go either way, okay? Fair enough?

Winslow: Go either way you want I know I'm innocent.

The Gage County Attorney's Office subsequently filed a complaint against Winslow for Wilson's murder.

On March 22, 1989, Taylor and Winslow submitted blood, hair, and saliva for testing. Neither suspect possessed type-B blood or was otherwise linked to the physical evidence recovered from the crime scene.[7] Meanwhile, Defendants continued to widen their net of suspects. Defendants interviewed Beth Johnson, who indicated that she watched television with Taylor, Winslow and Bishop at Bishop's apartment on the night of the murder. Defendants ignored this possible alibi for Taylor and Winslow, but nevertheless removed Johnson as a suspect. Similarly, Darren Munstermann, a former roommate of Taylor, Bishop, and Cliff Shelden, was ruled out as a suspect after Defendants interviewed him. However, during Munstermann's voluntary statement, Searcey asked a number of leading questions to get Munstermann to agree with Searcey's proposition that Taylor may have left Beatrice because of the murder and was acting "antsy" and "nervous" before she departed. Searcey also told Munstermann that he had been implicated in the murder

---

[7]White was also ruled out as a source of the B-type blood. However, the forensic examiner determined that White had the same blood type and similar genetic markers to Helen Wilson and stated that she could not exclude him as a source of the semen. However, the examiner clarified that she also could not exclude "approximately 43 to 44 percent of the population as being the semen donor."

by the other suspects and repeatedly accused Munstermann of being involved. Upon hearing this, Munstermann insisted that the other suspects were probably just "trying . . . to work a deal or something to get their sentence . . . down, there [sic] just coming up with, pulling stuff out of the air, you know, people they knew, and trying to get everybody in on it." Despite Searcey's badgering, Munstermann staunchly denied that he played any role in Wilson's murder, and he agreed to take a polygraph test, testify, and surrender blood, hair, and saliva samples.

On March 24, 1989, Searcey and Stevens interviewed Deb Shelden, who stated that Taylor sent Deb's husband Cliff a letter several months after the murder in which Taylor admitted her involvement. However, Searcey's report and Stevens's report of Deb's interview were markedly different. Stevens prepared his report on the day of the interview, and recorded that Deb stated that she never personally read Taylor's letter and simply recalled that Cliff told her that Taylor implicated herself in the letter. According to Stevens, Deb was also not sure whether White was mentioned in the letter. Indeed, the recorded portion of Deb's interview only mentions Taylor's involvement in the crime. But in Searcey's report, which was prepared almost a month after the interview, Searcey wrote that Deb stated that she "read the letter herself and that JoAnn Taylor had made a statement in that letter that Joseph Edgar White alias Lobo and . . . JoAnn Taylor were responsible for killing Helen Wilson."

On April 12, 1989, Searcey and Lamkin took a statement from Cliff Shelden in which he claimed that he received a letter from Taylor a week or two after the murder. When Searcey indicated that the letter was received a few months after the homicide, Cliff agreed. According to Cliff, Taylor's letter described how Taylor, White, and Winslow broke into Wilson's apartment, stole between $800 and $1800 from Wilson's "purse or some kind of container," and raped and murdered Wilson. Cliff also claimed that Winslow informed him that Taylor had actively participated in the murder by kissing Wilson on the lips and breast. Cliff added that Winslow told him that Deb was present and had tried to help Wilson, only to be injured when her head struck a mirror.

The next day, Searcey and Lamkin interviewed Deb Shelden for a second time. This time, Deb confessed to being present when Taylor, Winslow, and White raped and murdered Wilson. She claimed that the incident occurred at 7:30 p.m., that the rape occurred in the living room, and that the group searched the apartment for money, all of which conflicted with evidence collected at the scene. Deb stated that she tried to help Wilson, who was her great-aunt, but was shoved aside by White and injured her head. After a number of leading questions from Lamkin and Searcey to which Deb gave confusing and noncommittal answers, Deb finally agreed that she discovered blood in her hair after the murder.

On the morning of April 14, 1989, Defendants took blood, hair, and saliva samples from Deb Shelden. It was discovered that Deb did not have type-B blood and the samples did not match any evidence recovered from the crime scene. Later that day, Defendants reinterviewed Deb. On the day before, Deb stated that she, Taylor, Winslow, and White were the only ones in Wilson's apartment. This time, she stated that James Dean was also present at the murder but that she had been "blocking it" from her memory during prior interviews. At first, Deb indicated that Dean was also a concerned bystander during the murder, but as the interrogation went on, she agreed that Dean was "nonchalant" and later stated that he watched the crime and "liked it." During the interview, the Defendants asked multiple times whether anyone else had been injured in the apartment, with a focus on Dean.

Dean was arrested the next day and had biogenetic samples taken for testing, which determined that Dean's blood type was O negative. On April 16, Dean was interviewed for over two hours by Searcey, Lamkin, DeWitt, and Richard Smith. According to Dean, his repeated requests for a lawyer were ignored, and he denied any knowledge or participation in the crime. A second interview was conducted the next day, in which Dean was informed that Taylor, Deb Shelden, and Kathy Gonzalez had all implicated him in Wilson's murder. Although Dean was arraigned and given counsel on April 17, Dean claims that Searcey, Lamkin, DeWitt, and Richard Smith

-11-

repeatedly talked to him outside the presence of his attorney.[8]   On numerous occasions, Defendants also told Dean that he would receive the electric chair if he failed to cooperate with their investigation.  On April 29, Dean took a polygraph test and the examiner reported that Dean was being deceptive in his answers.

A few days later, Dean had a consultative session with Defendant Price, who was both a deputy and a police psychologist.  Dean again denied involvement in the homicide, but after Price confronted Dean with the polygraph results, Price reported that Dean "began to show that he was doubting the veracity of his own denials."  Price's consultation report states that as the session with Dean progressed, Dean "began to realize that the polygraph was revealing at least at the subconscious level his awareness that he was present in the apartment."  Price encouraged Dean to undergo "continuing supporting therapy" from Price to help Dean recall his repressed memories.  Dean evidently agreed to this, and Dean's attorney allowed Price to administer this therapy outside of his presence.  However, according to Dean, Price did not identify himself as a law enforcement official until the third "therapy" session.  Dean also claims that in the days following his arrest Searcey and Lamkin took him

_____

[8]In their reply brief, Defendants argue that the district court inappropriately relied on Dean's deposition testimony from 2010, in which he claims that he was illegally interviewed by Defendants without the presence of counsel on a number of occasions.  Defendants  argue that this evidence is "self-serving" and unreliable.  First, "[c]laims not raised in an opening brief are deemed waived. . . . This court does not consider issues raised for the first time on appeal in a reply brief 'unless the appellant gives some reason for failing to raise and brief the issue in his opening brief.'"  Jenkins v. Winter, 540 F.3d 742, 751 (8th Cir. 2008) (citation omitted).  Finding no such reason, we find that Defendants have waived this issue.  Second, even if we could address the issue, self-serving testimony is appropriately considered when it is "plausible, unchallenged and not circumstantially rebutted."  Thomas v. Runyon, 108 F.3d 957, 961 (8th Cir. 1997).  Here, defendants were not able to demonstrate any inconsistencies with the testimony or show a clear issue of credibility.  See id.

to Wilson's apartment, informed him "exactly what [he] had for breakfast the night of the murder," and showed him multiple photographs and a video from the crime scene.

On May 8, 1989, over three weeks after his arrest, Dean gave a recorded statement to the police in the hope of reaching a plea agreement. Dean stated that he could now remember that he was in Wilson's apartment with Taylor, Winslow, White, and Deb Shelden. He admitted that he could remember very few details from the incident but suggested that he might remember more facts in the future. Dean explained that he had changed his story after overcoming "some kind of subconscious block or something" and that he "remembered it in [his] sleep." In an interview with Searcey and Lamkin two days later, Dean reiterated that his memory of the crime was "all [from] a dream" and that he could not recall the incident until after he saw "the psychiatrist." At one point in the interview, Searcey asked Dean to describe where he, Winslow, Taylor, White, and Deb Shelden sat in Winslow's car on their way to Wilson's apartment, and Dean responded that Defendants had already "showed [him] a diagram of it." Searcey also asked many leading questions to "help" Dean remember the details of the murder.

On May 17, 1989, Searcey took another statement from Dean, in which Dean indicated that there was "another individual involved" in the murder who was in Wilson's apartment. Dean stated that he could not remember whether the person was male or female but thought it was probably a woman with shoulder-length light brown hair and either a medium or heavy build. Although Dean's prior statements demonstrated a complete inability to recall details of the assault on Wilson, this time Dean claimed that White and Winslow took turns raping Wilson while Taylor licked Wilson's chest and held her arms down. On May 18, Searcey obtained a photograph of Kathy Gonzalez from the BPD. Six days later, Searcey interviewed Dean again. During his March 24 statement, Dean claimed that he, Winslow, White, Taylor, and Deb Shelden were together when White and Taylor suggested robbing someone. Dean then identified Gonzalez as the person who was present in Wilson's apartment

during the murder. Dean further claimed that Gonzalez had been injured inside Wilson's apartment and that he saw her holding a cloth stained with blood.

Also on March 24, Searcey and Lamkin interviewed Deb Shelden again. Deb also stated that she remembered seeing Gonzalez during the homicide. She claimed that Gonzalez suffered a bloody nose and left the apartment during the crime. Deb stated that she "didn't remember [Gonzalez] at first," but then recalled her in a nightmare she had after thinking about the case. Deb stated that she was able to identify Gonzalez after asking Searcey to show her a picture of the "heavy set" woman with "dishwater blond hair" that she saw in her dream.

On May 25, 1989, Searcey, Lamkin, and DeWitt arrested Gonzalez, who had been living in the same apartment complex as Wilson when the murder occurred. A blood test determined that Gonzalez had type-B blood.[9] The next day, Price interviewed Gonzalez, who claimed that she was in her apartment on the night of the murder doing laundry and watching a movie. Price asked Gonzalez if she had ever suffered memory loss or blocked traumatic moments from her mind, and Gonzalez responded negatively and seemed very skeptical of Price's suggestion that she was

---

[9]This fact was used to convince Gonzalez to plead guilty and was used against White at his trial. However, a laboratory analysis determined that one of the genetic markers in Gonzalez's blood was incompatible with blood from the scene of the crime. The forensic examiner ultimately stated that she could not "be sure whether [Gonzalez] can or she cannot" be excluded as a source of the blood because it was theoretically possible that the blood at the scene of the crime was a mix between Gonzalez's blood and another individual. According to a stipulation entered at White's trial, type-B blood "similar" to Gonzalez's was found in five different places: on Wilson's gown, bedspread, two different sheets, and a pillowcase. As the district court observed, Gonzalez could have contributed to these stains only if there was at least one other contributor to all five stains who could account for the divergent genetic markers. Essentially, the prosecution's theory was based on the premise that Gonzalez and another person bled onto the exact same five places in Wilson's apartment, leaving a mixture in each place.

repressing memories of the incident. Nevertheless, Price repeatedly advised Gonzalez to let the memory of the crime return to her through her dreams. He told Gonzalez that traumatic experiences "[w]ill come back to you in some ways, often in dreams in little bits and pieces." He insisted that Gonzalez was repressing her memories, and that "if [he] had seen what took place [he] would have blanked it [out] too." Price added that several people had placed Gonzalez at the scene of the crime and implied that it was odd that she could not recall the incident. Gonzalez asked, "What happens if I don't remember?" Price responded, "[T]hen it's up to a court to decide . . . ." Price added that her treatment would be drastically different if she admitted to being there and not participating in the crime as opposed to being found an active participant. Price further suggested to Gonzalez that White would implicate her if it meant saving himself and told Gonzalez, "I have no idea what . . . Lobo [White] or JoAnn and Winslow are going to say about you." When Gonzalez stated that she did not even know who Winslow was, Price insisted that her mind was blocking it out because she did not want to remember him.

After maintaining her innocence for several weeks, Gonzalez took a polygraph test. The examiner noted that Gonzalez "really did not look 'guilty'" based on his evaluation, but he nevertheless told her "that she did not look very good" and advised her "to level with her attorney" and tell him "the full truth." The examiner had been informed prior to the test that Gonzalez's blood had been identified at the scene of the crime. Gonzalez claims that DeWitt, Searcey, and Smith told her the blood found at the scene was "100 percent" hers. According to Gonzalez, DeWitt also repeatedly threatened her with the death penalty. Ultimately, Gonzalez pled no contest in exchange for a recommended sentence of ten years, but maintained that she was not present at Wilson's murder.

Between June and October of 1989, Defendants continued to interview Dean, Taylor, and Cliff Shelden, who frequently supplied Defendants with new memories

and details about the crime. For example, Dean recalled that Gonzalez suddenly appeared in the hallway as Taylor, Winslow, White, Dean, and Deb Shelden made their way to Wilson's apartment. Dean also claimed that he remembered the group conspiring to rob Wilson. He added specific details about seeing Gonzalez bleeding in Wilson's apartment and stated that he knew "for a fact" that White "tore a five dollar bill in half," though he only "heard it rip." During another interview of Cliff Shelden, Cliff stated that he had never heard of Kathy Gonzalez and that he had never heard about any plan to rob Wilson. But after a few months, Cliff told Defendants that he remembered that Gonzalez "was supposed to be a lookout and give [the others] a signal." Taylor was similarly accommodating and stated in an August 30 interview that Dean had accompanied the group to Wilson's apartment and that at some point during the murder, Gonzalez entered Wilson's apartment and "was walking around kind of just checking things out." However, Taylor firmly resisted Defendants' suggestion that Taylor played an active role in raping and murdering Wilson, as Dean and Deb Shelden had stated. When Richard Smith accused Taylor of telling an inconsistent story, Taylor broke down crying, became incoherent, and could not recall basic facts about the crime scene. After a 23-minute break in the recording, Taylor requested that Searcey ask her questions "that might help bring it back better." After that point, Taylor agreed to many of Defendants' questions, but responded almost exclusively to leading or suggestive questions.

Not all of the recovered memories were deemed useful by Defendants. At one point, Dean claimed to have had "a little flash of memory" that Cliff Shelden was at the Wilson murder "standing in a doorway." Dean told his attorney that "the recollection of seeing Cliff at some time is very vivid." However, when Dean's attorney brought this information to DeWitt, DeWitt and Searcey declined to take a statement from Dean on this point because "the recollection was too fragmentary" and because it so obviously conflicted with the fact that Cliff Shelden was hospitalized on the evening of the murder.

Taylor, Deb Shelden, Dean and Gonzalez all entered into plea agreements and pled guilty or no contest to various criminal charges arising from the Wilson homicide. White adamantly maintained his innocence and pled not guilty to the charges against him. Taylor, Deb Shelden, Dean, and Gonzalez then testified against White at his trial. Winslow, however, refused to testify against White because any plea agreement would have required him to admit that both he and White sexually assaulted and murdered Wilson. A jury found White guilty of first-degree felony murder. After White was convicted, Winslow pled no contest to a charge of aiding and abetting second-degree murder. White served more than 18 years in prison before DNA testing exonerated him and the other five defendants from involvement in the Wilson murder.

After his release and exoneration, White filed a section 1983 action against Defendants.[10] White alleged violations of his due process rights under the Fifth and Fourteenth Amendments.[11] Specifically, White claimed that Defendants "deliberately and with reckless disregard of the truth, solicited, fabricated, manufactured and

_____

[10]The complaint also named Gage County, the GCSO, the GCAO, and Richard Smith, the county attorney, as defendants. The district court dismissed the GCSO and GCAO as defendants, finding that they could not be sued independently from the county. The court also dismissed Gage County as a defendant because the complaint did not allege a constitutional injury resulting from an official county policy or a widespread custom of the county. The claims against Richard Smith in his individual capacity were dismissed due to absolute immunity and are not at issue in this appeal. Finally, Kathy Gonzalez was originally a party to this action, but ultimately pursued her claims in a separate suit, which is before this court in another appeal. See Gonzalez v. Smith, No. 11-2884 (8th Cir. argued May 15, 2012). This appeal involves the claims of White alone.

[11]White also alleged false arrest and "unreasonable seizure" under the Fourth Amendment, and the district court concluded that those claims were time-barred in accordance with Wallace v. Kato, 549 U.S. 384 (2007). This ruling is not appealed by White.

coerced evidence they knew was false, fraudulent and profoundly lacking in reliability" and used it to obtain White's conviction in the Wilson homicide. Defendants moved for summary judgment on the basis of qualified immunity, arguing that their actions failed to "shock the conscience" and did not violate any established right Wilson possessed. The district court denied Defendants' motion, concluding that "[t]he plaintiffs' evidence shows that Searcey, DeWitt, Price, and Lamkin purposefully conspired to manufacture—and did manufacture—a case against White using false evidence. This is sufficient to establish that the defendants violated White's due process rights."

## II. Qualified Immunity

On appeal, Defendants argue that the district court erred in denying summary judgment on the basis of qualified immunity. Defendants contend that as a matter of law, White failed to make out a violation of a constitutional right. "Ordinarily, we have no jurisdiction to hear an immediate appeal from a district court's order denying summary judgment, because such an order is not a final decision. We do have limited authority, however, to review the denial of qualified immunity through an interlocutory appeal under the collateral order doctrine." Krout v. Goemmer, 583 F.3d 557, 563-64 (8th Cir. 2009) (internal citation omitted). "Our jurisdiction in such cases extends only to 'abstract issues of law,' not to 'determination[s] that the evidence is sufficient to permit a particular finding of fact after trial.'" Id. (citations omitted). "Appellate review in these circumstances is therefore limited to determin[ing] whether all of the conduct that the district court deemed sufficiently supported for purposes of summary judgment violated the plaintiff's clearly established federal rights." Shannon v. Koehler, 616 F.3d 855, 861 (8th Cir. 2010) (citations and alteration marks omitted).[12] "We review de novo the district court's

_____

[12]In their reply brief, Defendants challenge many of the factual findings made by the district court in deciding to deny qualified immunity. However, "in an

denial of a motion for summary judgment on the basis of qualified immunity." Nelson v. Corr. Med. Servs., 583 F.3d 522, 527 (8th Cir. 2009) (en banc). We view the record in the light most favorable to White and draw all reasonable inferences in his favor. Krout, 583 F.3d at 564.

"Qualified immunity shields government officials from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." Brown v. City of Golden Valley, 574 F.3d 491, 495 (8th Cir. 2009). Evaluating a claim of qualified immunity involves a "two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." Id. at 496 (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). "Unless the answer to both of these questions is yes, the defendants are entitled to qualified immunity." Krout, 583 F.3d at 564. A court may exercise its discretion in deciding which of the two prongs of the qualified immunity analysis to take up first. Pearson v. Callahan, 555 U.S. 223, 242 (2009).

## A. Violation of a Constitutional Right

We begin by addressing the contours of the constitutional right at issue. White's claims are founded in the Due Process Clause of the Fourteenth Amendment,

---

interlocutory appeal [from a denial of qualified immunity], we may not review a district court's finding of facts." Brown v. Fortner, 518 F.3d 552, 557 (8th Cir. 2008); see also Craighead v. Lee, 399 F.3d 954, 960 (8th Cir. 2005) ("[W]e must accept the summary judgment facts as described by the district court because evidentiary determinations are not presently appealable."). Moreover, to the extent Defendants argue that the court committed some legal error in its analysis by relying on certain facts, this argument does not appear in Defendants' opening brief and is therefore waived. See Jenkins, 540 F.3d at 751.

which provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "To establish a violation of substantive due process rights by an executive official, a plaintiff must show (1) that the official violated one or more fundamental constitutional rights, and (2) that the conduct of the executive official was shocking to the 'contemporary conscience.'" Flowers v. City of Minneapolis, 478 F.3d 869, 873 (8th Cir. 2007) (quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998)). Specifically, White contends that Defendants conspired to manufacture evidence against White and secure his conviction, thereby violating "the liberty interest . . . in obtaining fair criminal proceedings before being denied one's liberty in the most traditional sense." Wilson v. Lawrence Cnty., 260 F.3d 946, 956 n.8 (8th Cir. 2001).

### 1. Manufacture of False Evidence

"If officers use false evidence, including false testimony, to secure a conviction, the defendant's due process is violated." Wilson, 260 F.3d at 954; see also Napue v. People of State of Ill., 360 U.S. 264, 269 (1959) ("[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment."). We have recognized that a plaintiff can make out a violation of substantive due process by "offer[ing] evidence of a purposeful police conspiracy to manufacture, and the manufacture of, false evidence." Moran v. Clarke, 296 F.3d 638, 647 (8th Cir. 2002) (en banc). We agree with the district court that the facts give rise to a reasonable inference that Defendants purposefully manufactured false evidence to convict White.

The evidence suggests that Defendants systematically and intentionally coached witnesses into providing false testimony that fit Defendants' particular narrative of how the crime was committed. The interview transcripts involving JoAnn Taylor are replete with examples of this behavior. For instance, in Taylor's

-20-

initial statement, she only mentioned "Lobo" and an unknown "boy" and gave a narrative that was completely incompatible with the facts. Through leading questions and hints about basic facts, Searcey was able to reconstruct Taylor's statement to match the established evidence. Perhaps most concerning is how Taylor's narrative began to match Searcey's theory of the case after a break in the recording of her interview. Taylor's story and her ability to recall specific details drastically changed after the break. Indeed, over the course of the entire investigation, Taylor's narrative of the case changed multiple times, corroborating Defendants' latest theories and incorporating new suspects when they were suggested to her.

Some of the most alarming evidence that Defendants developed false testimony to use against White arises from the circumstances surrounding the arrests of Dean and Gonzalez. According to Searcey, Cliff Shelden informed him that Dean was possibly involved in the crime, but there is no mention of Dean in any of Cliff's recorded statements. Searcey and Lamkin then interrogated Deb Shelden on successive days. On the first day, Deb named Taylor, Winslow, and White as being involved and indicated that it was her blood that had been found at the scene of the crime. After it was determined that Deb did not have type-B blood, Searcey and Lamkin reinterrogated Deb. On this occasion, Searcey suggested that Dean was involved, and Deb suddenly "remembered" Dean's presence at the scene. These facts give rise to a reasonable inference that Searcey manipulated Deb into implicating Dean.

Deb's statement led to Dean's arrest on April 15, 1989. Dean repeatedly denied any involvement in Wilson's murder and indicated that he had absolutely no knowledge of the crime. No recorded interrogation of Dean took place until May 8, 1989. In the intervening period, Dean was kept in the county jail and there is evidence that Defendants subjected Dean to repeated interrogation without the presence of his counsel, repeatedly threatened Dean with the death penalty, fed Dean

information that fit Defendants' theory of the case, took Dean to Wilson's apartment, and showed Dean photographs and a video of the crime scene to help him "remember."

Another troubling piece of evidence is that Price offered to serve as Dean's therapist without initially informing Dean of his role as a law enforcement officer. Price then told Dean that his polygraph results indicated he was repressing memories of the crime. After weeks of being "counseled" by Price and pressured to independently recall information that was fed to him by Defendants, Dean professed to dreaming about the murder and to believing that he was present. When Dean volunteered this information to Defendants, they encouraged him to continue in his efforts to "remember" more information and held repeated interviews so that Dean could rehearse his story. In sum, these facts give rise to a reasonable inference that Defendants managed to overcome Dean's judgment and convince him that he was present at the murder so that he could implicate White and the other suspects. Indeed, Dean provided damning testimony at White's trial by reciting a narrative that matched Defendants' theory of the case.

Defendants' actions in their search for a suspect who could serve as a link to the forensic evidence also give rise to a reasonable inference that Defendants purposefully manufactured evidence against White. Searcey and Price returned to Deb Shelden, who is revealed in the transcripts to be one of Defendants' more suggestible witnesses. Although Gonzalez's name had never before been mentioned as a suspect, Searcey showed Deb a single photograph of Gonzalez after Deb apparently recalled seeing another person at the scene of the crime. Deb then "remembered" that this additional person at the scene of the crime was Gonzalez. On the same day, Dean inexplicably reached the exact same epiphany about Gonzalez being present at the murder after Searcey showed him Gonzalez's photograph. Searcey's arrest affidavit for Gonzalez stated that it was based on Deb's positive

identification of Gonzalez, but it did not mention that this identification only occurred after Deb had been in the county jail for six weeks and after Searcey showed Deb a picture of Gonzalez. Defendants then arrested Gonzalez, who turned out to have type-B blood.

These facts, when viewed in the light most favorable to White, give rise to the reasonable inference that Defendants intentionally fabricated evidence about Deb Shelden, James Dean, and Kathy Gonzalez in order to build a case against White and his alleged accomplices. Indeed, the circumstances surrounding the arrests of Deb, Dean, and Gonzalez allow a factfinder to identify a pattern whereby: Defendants first convinced a suspect that he or she was at the scene of the crime through lies, threats, leading questions, manipulative "therapy" sessions, and the alleged accusations of several other "accomplices"; and then if the suspect's blood was not a match for the blood found at the crime scene, Defendants manipulated the suspect into implicating yet another individual, thus beginning the process again. Defendants subjected both Deb Shelden and Dean to this, and it only ended after Gonzalez was determined to have type-B blood.

The facts, viewed in the light most favorable to White, also suggest that Defendants repeatedly ignored any evidence that did not fit within their narrative. From the beginning of Searcey's investigation, Searcey credited statements from questionable sources, such as Bishop and Podendorf, who tended to implicate White and his alleged accomplices, even when their statements contradicted readily verifiable facts. Searcey then drafted untimely and inaccurate reports about his investigation; there are no records of his independent investigation in 1985 other than the reports he drafted over three years later. Even after Searcey was officially authorized to investigate the case, his reports omitted details or contained discrepancies. For example, Searcey's report of his February 13, 1989 interview with Winslow omitted Winslow's claim that he loaned his car to Cliff Shelden on the night

-23-

of the murder, a claim Searcey knew to be implausible because Searcey was aware that Cliff was hospitalized at the time. And several weeks after the March 24 interview of Deb Shelden, Searcey wrote a report that conflicted with the timely report of BPD Officer Stevens. While Stevens reported that Deb never read a particular letter from Taylor to Cliff and that Deb could not recall if White was implicated in the crime, Searcey unequivocally stated that Deb had personally read Taylor's letter and that it implicated both Taylor and White. Later, when Dean was "remembering" suspects and details in his dreams, Defendants were all too eager to credit his testimony. But when Dean "remembered" that Cliff Shelden was present for the murder, both DeWitt and Searcey disregarded his testimony.

Finally, the record indicates that none of the suspects possessed any independent knowledge of facts that were consistent with the evidence found at the crime scene. With the exception of Taylor, who confessed to being present at Wilson's murder in a bizarre and implausible account, each suspect initially denied involvement and had no knowledge of the facts. Only White maintained his innocence, and the other suspects all confessed for various reasons. Winslow sought immunity, Gonzalez wanted a plea agreement to avoid the death penalty, and it appears that Deb Shelden and Dean both came to believe that they were present through suggestion, systematic pressure, and a reliance on "memories" recovered in their dreams. Even Taylor's initial statement came after North Carolina law enforcement officials told her she was present at the murder. But in these confessions, each of White's alleged accomplices refused to admit to an active role in the rape and murder of Wilson. Instead, White's alleged accomplices universally maintained that they were mere bystanders during the rape and murder. Based on the evidence in the interview transcripts, a reasonable factfinder could conclude that White's alleged accomplices were all coached by Defendants into reciting some semblance of a coherent story.

Defendants argue that there was sufficient evidence to demonstrate that they acted reasonably in believing that White and the other suspects were involved in the homicide. Based on the record, we acknowledge that a factfinder could conclude that Defendants were merely negligent in conducting their investigation, did not purposefully manufacture testimony, and had probable cause to believe that White was guilty. However, we must examine the facts in the light most favorable to White, see Krout, 583 F.3d at 564, and when viewed through that lens, we believe a factfinder could determine that White's conviction was the result of a purposeful conspiracy by Defendants to fabricate evidence against White.

Defendants also insist that they cannot be held liable simply because White's alleged accomplices kept changing their stories or because Defendants believed certain witnesses, followed certain leads, and discounted evidence they found incredible. We agree with Defendants' propositions as a general matter. However, the facts in this case support a finding that Defendants were not merely mistaken or thrown off by the changing stories of White's alleged accomplices. The facts allow a reasonable factfinder to conclude that Defendants *purposefully* fabricated evidence to obtain White's conviction. The record shows that Defendants coached and manipulated White's alleged accomplices into adopting Defendants' theory of the case up until White's trial. Some of the investigative techniques used by Defendants, such as the single-photograph identification process that led to the arrest of Gonzalez, further support the inference that Defendants acted purposefully. The interview transcripts also contain a number of inexplicable moments where White's alleged accomplices completely changed their stories or suddenly remembered important details about the crime after breaks in the tape recording. Both Dean and Taylor testified against White at White's trial, reciting a narrative that matched Defendants' theory of the case. These facts, combined with the numerous examples of Defendants' unwillingness to acknowledge blatant discrepancies or implausibilities in their theory of the case, allow a reasonable juror to draw the inference that

Defendants purposefully fabricated testimony in order to convict White. Accordingly, we agree with the district court that the facts, viewed in the light most favorable to White, demonstrate a violation of White's substantive due process liberty interest in obtaining fair criminal proceedings.

Finally, Defendants argue that White failed to demonstrate the elements of a conspiracy between Defendants to manufacture a case against White. "To be liable as a conspirator [one] must be a voluntary participant in a common venture . . . . It is enough if [Defendants] understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do [their] part to further them." Jones v. City of Chicago, 856 F.2d 985, 992 (7th Cir. 1988) (affirming a jury's finding of civil liability for police officers who conspired to fabricate evidence and used it to prosecute an innocent defendant). In the instant case, the facts viewed in the light most favorable to White give rise to the reasonable inference that Defendants acted in concert with the goal of securing White's conviction for the rape and murder of Helen Wilson. Thus, the district court did not err in denying Defendants' request for summary judgment on the conspiracy claim.

### 2. Shocks the Conscience

We must now determine whether the district court correctly concluded that Defendants' violations of White's constitutional rights were "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Lewis, 523 U.S. at 847 n.8. In order to "shock the conscience," it is not enough that the government official's behavior meets the "lowest common denominator of customary tort liability." Id. at 848-49. Rather, "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." Id. at 849. Only the most severe violations of individual rights that result from the "brutal and inhumane abuse of official power"

rise to this level. C.N. v. Willmar Pub. Schs., Indep. Sch. Dist. No. 347, 591 F.3d 624, 634 (8th Cir. 2010) (citation omitted).

We agree with the district court that, viewing the facts and inferences discussed above in the light most favorable to White, Defendants' conduct in this case shocks the conscience. There can be little doubt that intentionally manufacturing false evidence to convict a criminal defendant is the sort of "brutal and inhumane abuse of official power" that shocks the conscience. See Moran, 296 F.3d at 647 (suggesting that "evidence that officials purposely conspired to manufacture evidence in order to make [the defendant] an innocent scapegoat" could shock the conscience). We have also previously recognized that the following circumstances indicate conscience-shocking behavior in the context of a reckless or intentional failure to investigate claim: "(1) evidence that the state actor attempted to coerce or threaten the defendant, (2) evidence that investigators purposefully ignored evidence suggesting the defendant's innocence, (3) evidence of systematic pressure to implicate the defendant in the face of contrary evidence." Akins v. Epperly, 588 F.3d 1178, 1184 (8th Cir. 2009).

In the instant case, there is evidence that Defendants: successfully coerced and threatened White's co-defendants into implicating themselves and White in Wilson's murder; repeatedly ignored inconsistencies and implausibilities in the testimony implicating White; and exercised systematic pressure to procure White's conviction despite the unreliability of the evidence that he was involved. Ultimately, White was placed in the nightmare scenario of having to maintain his innocence in the face of five co-defendants who were systematically manipulated or convinced into falsely accusing White of rape and murder. Accordingly, we agree with the district court that a factfinder could reasonably infer that Defendants' actions shocked the conscience.

## B. Clearly Established

We turn now to the second prong of the qualified immunity inquiry, which requires us to determine whether White's right to be free from the purposeful use of false evidence to secure his conviction was clearly established in 1989. "When determining whether an action was a clearly established constitutional violation, we look to the state of the law at the time of the incident." Shekleton v. Eichenberger, 677 F.3d 361, 366 (8th Cir. 2012). "A right is 'clearly established' when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." Birkenholz v. Sluyter, 857 F.2d 1214, 1216 (8th Cir. 1988) (citing Anderson v. Creighton, 483 U.S. 635, 640 (1987)). "[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." United States v. Lanier, 520 U.S. 259, 271 (1997) (citation and alteration marks omitted). Indeed, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Hope v. Pelzer, 536 U.S. 730, 741 (2002).

Defendants argue that White "failed to demonstrate that the constitutional right to be free from reckless investigatory police work was clearly established in 1989." We must reject Defendants' contention based on our decision in Wilson, where we previously addressed this issue. In Wilson, the plaintiff brought a section 1983 action against law enforcement officials for their conduct in a murder investigation that culminated in the plaintiff's wrongful conviction. Wilson alleged that the officers recklessly investigated the case, coerced a false inculpatory statement from another suspect, and subsequently used "this unreliable, manufactured evidence against him." 260 F.3d at 950. The district court denied the officers qualified immunity and we affirmed, recognizing that the general right to "obtaining fair criminal proceedings" was well-established by Brady v. Maryland, 373 U.S. 83, 87 (1963) (suppression of

exculpatory evidence violates due process), and <u>Napue</u>, 360 U.S. at 269 (use of false evidence at trial violated due process). <u>Wilson</u>, 260 F.3d at 956 n.8. In <u>Wilson</u>, we concluded that the plaintiff's claim of a reckless investigation that took place in 1986 could proceed, thus demonstrating that the right was clearly established at that time. Accordingly, the right to be free from a reckless investigation was also clearly established during the 1989 investigation in this case.

Furthermore, White did not merely allege that Defendants recklessly investigated the Wilson murder; rather, he claimed that Defendants purposefully conspired to manufacture false testimony that was used against him. In its order, the district court indicated that Defendants conceded that such behavior was a clearly established constitutional violation. To the extent that Defendants now argue this point, we agree with the district court that the right to be free from a conviction purposefully obtained by false evidence and false testimony has long been clearly established. <u>See</u> <u>Napue</u>, 360 U.S. at 269; <u>Mooney v. Holohan</u>, 294 U.S. 103, 112 (1935) (per curiam) ("[Due process] is a requirement that cannot be deemed to be satisfied by mere notice and hearing if a state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured.").

## III. Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

_____