# United States Court of Appeals
## For the Eighth Circuit
_____

No. 23-1074
_____

Independence-Alliance Party of Minnesota; Hugh McTavish

*Plaintiffs - Appellants*

v.

Steve Simon, in his official capacity as the Minnesota secretary of state, or his successor

*Defendant - Appellee*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: October 17, 2023
Filed: December 1, 2023
_____

Before GRUENDER, STRAS, and KOBES, Circuit Judges.
_____

GRUENDER, Circuit Judge.

The Independence-Alliance Party of Minnesota ("Party") appeals the dismissal of its complaint challenging the lawfulness of a requirement that voters swear an oath before signing a minor-party nominating petition. *See* Minn. Stat. § 204B.07, subd. 4. We affirm.

## I.

In Minnesota, the process for nominating major-party candidates to appear on the general election ballot differs from the process for minor-party candidates. Major-party candidates are nominated by primary election, while minor-party candidates can appear on the general election ballot if they successfully submit a nominating petition. *See* Minn. Stat. §§ 204B.03, 204B.07, 204B.08. The nominating-petition process requires prospective minor-party candidates to collect signatures from eligible voters. *See id.* § 204B.08. And in order to sign, each eligible voter is required to swear an oath. *See id.* § 204B.07, subd. 1, 4. The required oath reads:

> I solemnly swear (or affirm) that I know the contents and purpose of this petition, that I do not intend to vote at the primary election for the office for which this nominating petition is made, and that I signed this petition of my own free will.

*Id.* § 204B.07, subd. 4. Those who falsely swear the oath are guilty of perjury, punishable by up to five years in prison, a $10,000 fine, or both. *Id.* § 204B.07, subd. 6; *see also id.* § 609.48.

The Independence-Alliance Party of Minnesota is a minor political party that regularly fields candidates for partisan office in Minnesota's general elections. The Party has successfully used the nominating-petition procedure in the past. To ensure its nominating petitions comply with Minnesota law, the Party recruits and trains volunteers to solicit signatures and answer questions about the oath requirement. The Party alleges that potential signatories often ask volunteers about the oath; that potential signatories are sometimes reluctant or even unwilling to sign a nominating petition because of the oath requirement; and that there appears to be concern by some potential signatories that signing the oath means giving up the right to vote in the primary election.

The Party sued the Minnesota Secretary of State, alleging that the oath requirement violates the First Amendment because it burdens the expressive

associational rights of minor political parties, their members, and their candidates by deterring voters from signing nominating petitions. Applying the *Anderson-Burdick* framework, the district court[1] declined to apply strict scrutiny because the Party plausibly alleged that "at most" the oath requirement imposed an insubstantial burden on expressive association. The court then concluded that important election interests justified that insubstantial burden. This appeal followed.

## II.

We review *de novo* the district court's grant of a motion to dismiss, accepting as true all factual allegations in the complaint and drawing all reasonable inferences in favor of the nonmoving party. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014).

The Party argues that all associational rights claims are subject to strict scrutiny, and the district court therefore erred by not applying strict scrutiny to the oath requirement. Alternatively, the Party argues that the district court erred when it determined that the oath requirement imposes, at most, an insubstantial burden on expressive association and then concluded that the burden was sufficiently justified.[2] We address each argument in turn.

### A.

First, it is well-established that "not every electoral law that burdens associational rights is subject to strict scrutiny." *Clingman v. Beaver*, 544 U.S. 581, 592 (2005). Instead, the proper level of scrutiny is determined under the framework laid out in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*,

---

[1]The Honorable Eric C. Tostrud, United States District Judge for the District of Minnesota.

[2]The complaint purported to raise facial and as-applied challenges. However, the district court concluded that, in substance, plaintiffs brought only a facial challenge. The Party does not challenge this conclusion on appeal, so we consider only the facial challenge. *See White v. Smith*, 696 F.3d 740, 749 n.8 (8th Cir. 2012) (noting issues not raised on appeal are waived).

504 U.S. 428 (1992). *See Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 607 (8th Cir. 2020) (applying the *Anderson-Burdick* framework). The district court applied the *Anderson-Burdick* framework. *See Independence-Alliance Party of Minn. v. Simon*, 646 F. Supp. 3d 1018, 1027 (D. Minn. 2022). It did not err by refusing to automatically apply strict scrutiny merely because the case implicates associational rights.

B.

The Party next argues that the district court erred by finding that the oath requirement imposed, at most, an insubstantial burden and that this burden was sufficiently justified by state interests. *See Independence-Alliance Party*, 646 F. Supp. 3d at 1027. This argument also fails.

1.

Under the *Anderson-Burdick* framework, to determine the appropriate level of scrutiny to apply in a challenge alleging that an election regulation infringes on voting or associational rights, we "weigh 'the character and magnitude of the asserted injury to the rights protected by the First Amendment . . . that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). Only when a regulation subjects voters' rights to a "severe" burden does strict scrutiny apply: then, the regulation must be "narrowly tailored and advance a compelling state interest." *Org. for Black Struggle*, 978 F.3d at 607 (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)). "Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Id.* (internal quotation marks omitted). With this framework in mind, we next consider the burden imposed by the oath requirement.

The Party argues that the oath requirement burdens associational rights because the oath requires signatories to "promise not to do something good in the future"—not to vote in a major-political-party primary for the same office sought by

the petitioning candidate. Or, at a minimum, the Party argues that the oath requirement burdens associational rights because voters reasonably interpret the oath this way. The Party claims that, because the oath does not give voters explicit notice that their interpretation is incorrect, "voters are unwilling to sign" nominating petitions. The Secretary, on the other hand, asserts that the plain language of the oath makes clear to signatories that they are only swearing to a lack of present intent to vote in the relevant primary. In other words, a signatory should know that the oath does not prohibit him from changing his mind at any time after signing.

The Secretary has the better argument. The oath requires a would-be signatory to pledge only that he does "not intend to vote at the primary election for the office for which this nominating petition is made." Minn. Stat. § 204B.07, subd. 4. The Party offers no meaningful support for the proposition that swearing to one's intent at a particular time somehow renders that intent immutable. The Party does not allege or identify any circumstances in which the word "intend" has borne the ambiguous or uncertain meaning the Party would like to credit it with here. Nor does the Party identify any context in which "intend" has served as a prohibition on changing one's planned course of action in the future. Similarly, the Party provides no support for the proposition that such an oath must be caveated by explicit notice to signatories that they can change their minds.

Indeed, we have already embraced the Secretary's interpretation of the oath—albeit in an unpublished opinion. *See Libertarian Party of Minnesota v. Simon*, No. 20-2244, 2021 WL 4026159 (8th Cir. Sept. 3, 2021), *aff'g* 463 F. Supp. 3d 936 (D. Minn. 2020). There, we noted that voters "are free to change their minds" after signing a nominating petition, and that, if they do so, they then have the same opportunity to vote in secret afforded to anyone who did not sign a petition. *Id.* at *2; *see also Libertarian Party of Minnesota*, 463 F. Supp. 3d at 941 ("[T]he oath only requires signers to attest to a present intention not to vote in an upcoming primary. . . . [I]t does not preclude signers from changing their minds thereafter[.]"). The plain language of the oath requires that a signatory pledge only present intent

not to participate in a particular subsequent primary. Signatories do not violate the oath if they change their minds thereafter.[3]

The Party also argues that, regardless of whether the oath *actually* bans subsequent primary voting, voters still interpret it to do so. According to the Party, "[t]he oath requirement is a legally-required hindrance to achieve the only requirement to appear on the ballot—a certain number of signatures on the petition." The Party asserts that the oath requirement results in the loss of signatories who refuse to sign because they do not want to give up the right to vote in a major-party primary and who refuse to sign because they are fearful of being subject to prosecution under the perjury provision. We conclude this is not a severe burden.

First, citizens are presumed to know the law. *See Georgia v. Public.Resource.Org, Inc.*, 590 U.S. ---, 140 S. Ct. 1498, 1507 (2020); *see also State v. King,* 257 N.W.2d 693, 697-98 (Minn. 1977) ("All members of an ordered society are presumed either to know the law or, at least, to have acquainted themselves with those laws that are likely to affect their usual activities."). As discussed above, the plain meaning of the oath requires only a pledge of present intent. And, even before today, at least one case clarified that signatories are not prohibited from changing their minds after signing and, by extension, would not be subject to prosecution for doing so. *See Libertarian Party of Minnesota*, 2021 WL 4026159, at \*2; *Libertarian Party of Minnesota*, 463 F. Supp. 3d at 941. Thus, voters can reasonably be expected to understand the oath's actual meaning. And if they understand the oath, then they understand that, if they change their mind after signing, they will still be entitled to vote in the primary and would not face prosecution.

Second, the Party acknowledges that voters have no right both to sign a nominating petition *and* vote in a primary. *See Storer v. Brown*, 415 U.S. 724, 741 (1974) ("[T]he State is warranted in limiting the voter to participating in but one of

---

[3]This view does not render the oath toothless "surplus," as the Party contends. A signatory could be prosecuted if the signatory intended to vote in a subsequent primary at the time he signed the nominating petition.

the two alternative procedures, the partisan or the nonpartisan, for nominating candidates for the general election ballot."). In other words, even if the statute required voters to choose between signing a nominating petition and voting in a major-party primary—and even if the statute subjected voters to prosecution any time they did both—the Party concedes that such a burden would be lawful. As the district court correctly concluded, "[i]f one concedes—as the Party has—that the oath would be constitutional if it prohibited petition signers from voting in a primary, then it is difficult to understand how § 204B.07, subd. 4's less rigid, more nuanced approach might cause the Party greater harm or be unconstitutional." *Independence-Alliance Party*, 646 F. Supp. 3d at 1030.

Third, the Party's complaint does not plausibly allege that the oath requirement prevents signatories from signing nominating petitions with any meaningful frequency. *Cf. Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). It only states that "[s]ome voters" are reluctant or unwilling to sign because of the oath. That "some" unspecified voters are reluctant to sign does not plausibly demonstrate a severe burden.

2.

We next consider whether any insubstantial burden imposed by the oath requirement is justified by legitimate state interests. *Org. for Black Struggle*, 978 F.3d at 607. Important interests which may justify election regulations include protecting the democratic voting process by requiring a preliminary showing of support for a candidate before that candidate appears on the ballot, *McLain v. Meier*, 851 F.2d 1045, 1051 (8th Cir. 1988) (collecting cases), and preventing the distortion of the electoral process by the "fielding [of] an 'independent' candidate to capture and bleed off votes in the general election that might well go to another party," *Storer*, 415 U.S. at 735.

The oath requirement helps to promote election integrity and reliability by ensuring not only that a certain number of eligible voters are willing to sign a petition to put a minor-party candidate on the ballot but also that the eligible voters signing the petition actually intend to vote for that candidate. *See McLain*, 851 F.3d at 1051.

The oath also ensures election integrity by discouraging party raiding and making it more difficult for major-party candidates to use "spoiler" or "stalking horse" candidates to draw off support from their opponents. *See Storer*, 415 U.S. at 735. Thus, to the extent that the oath requirement places an insubstantial burden on expressive association, it is justified by these interests.

### III.

For these reasons, we affirm the judgment of the district court.

_____